# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

## CASE NO. 21-cv-21714-GOODMAN
## [CONSENT]

GUANTANAMERA CIGARS COMPANY,
a Florida corporation,

       Plaintiff,

v.

SMCI HOLDING, INC., et al.,

       Defendants.

_____/

## OMNIBUS ORDER ON PLAINTIFF'S *DAUBERT* MOTIONS

Plaintiff Guantanamera Cigars Company ("Guantanamera" or "Plaintiff"),

manufacturer of a cigar bearing the name "DUO", filed a three-count lawsuit against

Defendants SMCI Holding Inc., Swedish Match North America, LLC, Swedish Match

USA, Inc. (collectively, "Swedish Match"), Sam's West, Inc. d/b/a/ Sam's Club, and Costco

Wholesale Corporation based on the production, sale, and marketing of cigarillos bearing

the name "DUOS." [ECF No. 1]. Plaintiff sued Defendants for federal Trademark

Infringement, federal Unfair Competition, and common law Trademark Infringement. *Id.*

Defendants filed a two-count Counterclaim against Plaintiff for: (1) Declaratory

Judgment on Trademark Infringement and (2) Declaratory Judgment on Fair Use.[1] [ECF No. 36].

In support of their defense and counterclaims, Defendants enlisted three experts: (1) Rushabh Patel, a CEO with more than a decade of experience in sales, marketing, business strategy, and managing the day-to-day operations of cigar and smoking product/accessory companies; (2) Robert Leonard, a tenured professor of linguistics at Hofstra University; and (3) Charles Taylor, a professor of marketing at the Villanova School of Business, and former President of the American Academy of Advertising.

Plaintiff filed three *Daubert*[2] motions seeking to exclude the entirety of the testimony and opinions of Rushabh Patel, Robert Leonard and Charles Taylor. [ECF Nos. 163; 164; 167]. Each *Daubert* motion has been fully briefed with a response [ECF Nos. 178; 180; 181] and a reply [ECF Nos. 185; 186; 187].

For the reasons outlined below, the Undersigned **grants in part and denies in part** Plaintiff's Motion to Exclude the Testimony of Rushabh Patel [ECF No. 163]; **denies** Plaintiff's Motion to Exclude the Testimony of Robert Leonard [ECF No. 164]; and **grants in part and denies in part** Plaintiff's Motion to Exclude the Testimony of Charles Taylor

---

[1]	Defendants' first counterclaim included eight counts. [ECF No. 12]. In Defendants' Amended Answer and Counterclaim, they left only these two counts from the original.

[2]	*Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

[ECF No. 167].

## I.      CLAIMS AND INTRODUCTION

Guantanamera has been in the cigar industry since 1997. It produces many different types of cigars, including, relevant to this case, cigars bearing the "DUO" mark as an identifier. Guantanamera began producing, marketing, and selling its "DUO" cigars in 2008 and has been continuously and exclusively using the mark since its inception. On August 4, 2009, Guantanamera registered U.S. Trademark Registration No. 3,664,534 for "DUO" for use in connection with Cigars in International Class 34. The Registration became incontestable in 2016.

In or about August 2020, Swedish Match, a multinational tobacco company, launched a new cigar product bearing the term "DUOS." Before launch, Swedish Match conducted a trademark search for "DUOS" and the results returned Plaintiff's live trademark as the only one including terms "DUOS" or "DUO."

Guantanamera's "DUO" cigars are considered premium cigars, as defined by the FDA. These cigars are handmade and contain foreign-grown tobacco. In contrast, Swedish Match's White Owl[3]-branded cigarillos do not qualify as premium cigars as

---

[3]      Swedish Match's "DUOS" cigarillos were part of its White Owl branding and are encompassed in this general description of Swedish Match's products. Swedish Match no longer markets its dual, complimentary-flavored, cigarillos as "DUOS" and, instead, now uses the term "Pairs."

defined by the FDA. Its cigarillos are machine-made, mass produced, have non-tobacco flavors added, and sell for as little as 99 cents for a package of two.

Plaintiff alleges that it is the owner of an incontestable trademark for the mark "DUO" for use in connection with Cigars in International Class 34. It claims that Swedish Match and the other Defendants adopted and used "DUOS" as a trademark in connection with the sale of cigars. In Plaintiff's view, the "DUOS" mark is confusingly similar to its own "DUO" mark. In its prayer for relief, Plaintiff seeks compensatory or statutory damages, a temporary and permanent injunction, attorneys' fees and costs, and other remedies that the Court may award.[4]

Defendants' theory is that its "DUOS" mark is descriptive of the fact that its product contains two complimentary-flavored cigarillos (i.e., berries and cream, mango and pineapple, etc.). They contend that Plaintiff's incontestable mark is weak and unworthy of trademark protection. In Defendants' view, despite their marketing of similar products, there is very little, if any, overlap between the two product lines, and they are each sold, marketed, and consumed in noticeably different ways.

In support of their theory, Defendants enlisted three experts to testify on the linguistic meaning of the words "duo" or "duos", the tobacco/cigar industry, and

---

[4]     In Plaintiff's Rule 26 disclosure, it reveals that it is no longer seeking actual damages and is instead seeking disgorgement, attorney fees, and the possible trebling of damages. [ECF No. 169-9].

marketing principles. Plaintiff seeks wholesale exclusion of each opinion and contends that each expert has relied on unreliable or non-existent methods, bad or unreliable data, or is not offering any actual expert testimony.

## II.  LEGAL FRAMEWORK

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 582 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d

at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d 1300 (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d 1244 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

If a case is proceeding as a bench trial, the court's gatekeeper function is relaxed. While *Daubert* requires trial courts to act as "gatekeepers" to ensure a jury is not exposed to "speculative, unreliable expert testimony," *McCorvey*, 298 F.3d at 1256, these concerns "are greatly reduced when the expert will testify during a bench trial," *Exim Brickell LLC v. Bariven, S.A.*, No. 09-CV-20915, 2011 WL 13131317, at *4 (S.D. Fla. Mar. 11, 2011). As stated by the Eleventh Circuit, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

## III.   ANALYSIS

Although Defendants' three experts each seek to offer opinions on largely distinct topics, Plaintiff's requests to exclude their testimony are indistinguishable in many instances. As an overarching theme, Plaintiff alleges the expert opinions are an attempt to evade the binding deposition testimony of Defendants' 30(b)(6) witness, Brian Love, about the meaning of the terms "duo" or "duos." Plaintiff also complains that Defendants' experts ignore or undervalue record evidence that Plaintiff believes to be either important or determinative of the parties' claims. As its final common arguments, Plaintiff attacks the reliability of the expert's methodology or it claims that the subject matter is inappropriate for expert testimony.

As will be discussed below, Plaintiff's arguments are largely unavailing. Because

9

many of Plaintiff's arguments in support of exclusion are common across each expert (e.g., the expert should have considered the focus group, the expert should have considered the marketing materials, this study says no research has been done on the topic, the expert ignored this fact, etc.), certain legal principles can be commonly applied in the analysis. Before addressing the specifics of Plaintiff's arguments, the Undersigned will discuss one of those important legal principles:

"[I]t is not for the Court, on a *Daubert* motion, to determine the credibility and persuasiveness of [an expert's] opinions." *Goldberg v. Aon Risk Servs., Ne., Inc.*, No. 13-21653-CIV, 2018 WL 4479437, at *7 (S.D. Fla. Sept. 12, 2018). Nor is it appropriate for the Court to exclude otherwise admissible expert testimony on the basis that the opposing party disagrees with the facts or evidence considered. *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014) ("PEI also argues that Dr. Wood improperly weighted the data, included improper questions, and failed to employ proper quality controls. These criticisms likewise go to the weight of her opinions, not their admissibility."); *Hersh v. Cavache, Inc.*, No. 17-14212-CIV, 2018 WL 6978638, at *2 (S.D. Fla. Aug. 23, 2018), report and recommendation adopted sub nom. *Hersh v. United States*, No. 17-14212-CIV, 2018 WL 6978628 (S.D. Fla. Dec. 7, 2018) (rejecting exclusion argument even though the expert reports were possibly "based on incomplete or wrong information").

"[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the **weight** of the evidence **rather than its admissibility**." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation and citation omitted) (emphasis supplied); *see also Quiet Tech DC–8, Inc.*, 326 F.3d. at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

This principle is well settled throughout the country. *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] [-- that the expert's report was too small a sample of evidence --] were brought out forcefully at trial . . . . These matters go to the weight of the expert's testimony rather than to its admissibility."); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (reversing district court's decision to exclude an expert's testimony as unreliable even though there was scientific literature which "cast doubt on [the expert's] position"); *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345 (rejecting the argument that an expert should be excluded because "the specific numbers that [he] used were wrong").

Although the law is replete with cases discussing this principle, Plaintiff failed to address it in its initial motions. Then, after being confronted with the issue by Defendants' responses, Plaintiff continued to ignore the issue in its replies -- instead, often choosing

to double-down on its dissatisfaction or disagreement with the considered expert opinion evidence. As will be discussed below, large sections of Plaintiff's arguments are premised on a belief that Defendants' experts should have considered certain facts or evidence. As explained more thoroughly below, Plaintiff's appropriate recourse in most instances is to address the suspected faults, omissions, and lack of diligence during cross examination.

  a. *Rushabh Patel*[5]

  Patel is the CEO of Liv Sales, LLC and Aire Brands LLC, which market non-nicotine and non-tobacco smoking products and accessories. He also launched and serves as the CEO of Unitabac, LLC, which currently markets and sells premium hand-made cigars, as well as non-tobacco/non-nicotine products, and previously sold mass-market, machine-made cigars.

  Patel has more than a decade of experience in sales, marketing, business strategy, and management of the day-to-day operations of companies involved in both the mass-market, machine-made cigar and premium hand-made cigar industries. Currently, he oversees the day-to-day operation of Unitabac, including developing and executing marketing strategies, maintaining relationships with trade partners (including wholesale

---

[5] A copy of Patel's most-recent expert report, including his qualifications, is filed in full on CM/ECF, with no redactions. [ECF No. 163-2]. The Undersigned's summary of Patel's background and opinions is derived from this exhibit. Although the document is titled "Supplemented Expert Report," Plaintiff indicates that the report and the other documents authored by Patel are functionally identical.

distributors and retail stores), overseeing all regulatory and intellectual property activities, and sourcing products from overseas manufacturers. Unitabac has sold more than 425 million mass-market, machine-made cigars and more than 2 million premium, hand-made cigars.

Patel was retained to evaluate and offer his opinion on the following topics:

- Comparison of the markets -- including retail pricing, marketing, distribution and sales issues for premium, hand-made cigars and mass-market, machine-made cigars, including cigarillos.

- Comparison of the product profiles -- including product profiles, product ingredients, and production methods between premium, hand-made cigars and mass-market, machine-made cigars.

- Comparison of the typical purchasing environment and experience between premium, hand-made and mass-market, machine-made cigars.

- Comparison of the demographics of premium, hand-made cigar purchasers versus mass-market, machine-made cigar purchasers.

Plaintiff argues that Patel's opinions and testimony should be excluded because they are "the product of unreliable methods, unreliable purported evidence, lack data in support, and are not the sort of 'scientific, technical, or specialized' opinions for which expert testimony is appropriate." [ECF No. 163]. In Plaintiff's view, Patel "appears to make it up as he goes along." *Id.* Defendants summarize Plaintiff's arguments as a two-pronged attack: (1) a belief that Patel relied upon bad evidence; and (2) a belief that Patel's report is faulty. [ECF No. 178]. These arguments, Defendants say, are unpersuasive and

ultimately raise questions that go only "to the weight that should be given to [Patel's] opinions, not their admissibility." *Id.*

Patel's Report is divided into four separate sections. Plaintiff's arguments are organized in kind.

First, Plaintiff argues for exclusion of the entirety of Patel's Report's Background Section. Its argument begins with the same opening salvo from Plaintiff's introduction: the entirety of the section is "the product of unreliable methods, unreliable purported evidence, lack data in support, and are not the sort of 'scientific, technical, or specialized' opinions for which expert testimony is appropriate" and Patel "seems to make it up as he goes along."

In the background section of Patel's report, he provides the Food and Drug Administration ("FDA") definition of a "premium cigar," information regarding Plaintiff's website description of its "DUO" cigar, and production information based on his purchase of "DUO" cigars. Patel then compares the "DUO" cigars to the FDA definition of "premium cigars" and determines that Plaintiff's product falls within that category. Further, Patel opines that the product also falls into a narrower subset of "ultra-premium" cigars.

Although Plaintiff seeks to strike the *entirety* of the background section, it provides only the "ultra-premium cigar" definition as an example of an opinion formed by only

Patel's purported *ipse dixit[6]*, rather than reliable methodology.

Patel provides very little information regarding how he reached the conclusion that Plaintiff's "DUO" cigars qualify as "ultra-premium" cigars. The only "evidence" he cites supporting this contention is Plaintiff's self-aggrandizing product-description on its website and the price-point of the cigar, which Patel claims "would place this product at the high end of the premium cigar market." Defendants claim this opinion is admissible and that Plaintiff is ignoring Patel's analysis.

Although Defendants are correct that Plaintiff is downplaying Patel's analysis, Plaintiff is correct that Patel has not shown a reliable methodology. Certainly, as Defendants argue, expertise can be based on experience; however, there must still be a reliable methodology behind the expert's opinion. Although there may be overlap between these two considerations, the inquiry is not identical.

The Eleventh Circuit has summarized this interplay as follows:

---

[6]      "*Ipse dixit* is a Latin phrase that translates to "he said it himself." *Ipse dixit* means a person's own assertion without relying on any authority or proof. It usually implies an assertion of authority, as in a statement is true based on the speaker's authority and not back by any proof." https://www.law.cornell.edu/wex/ipse_dixit (last visited March 23, 2022); *see also Earle v. Ratliff*, 998 S.W. 2d 882, 890 (Tex. Sup. Ct. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must **explain** the basis of his statements to link his conclusions to the facts.") (emphasis added); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

>    Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. ... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1241-42. Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility.

*Frazier*, 387 F.3d at 1261 (en banc).

"If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Id.*

In assessing the reliability of an expert's particular opinion, the Court should consider, to the extent possible: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. As mentioned previously, however, these factors are non-exhaustive. *Id.*

In this situation, Patel offers no information about why price impacts whether a cigar qualifies as "ultra-premium" or why he chose the 75th percentile price-point as his cutoff for "ultra-premium" cigars. He further offers no information about whether ingredients, structure, location, manufacturing process, rarity, or any other factor plays a

role in his definition of "ultra-premium." Nor does he offer any information about whether this is an accepted definition in the tobacco community.

At bottom, the Undersigned agrees with Plaintiff's position that Patel seemingly pulled *this* opinion out of thin air. If Patel has a basis to support his conclusion about ultra-premium cigars, then he has not articulated it. Thus, Plaintiff's motion should be granted on this one specific point.

However, this argument is unpersuasive as to the remainder of Patel's opinions in the background section of his report. But it is compelling as to a few other opinions, albeit not additional ones in the background section.

Plaintiff does not identify with particularity any other unreliable opinion in Patel's background section. Other than its categorical introductory statement, Plaintiff makes no attempt to explain how Patel's method of opining on whether Plaintiff's "DUO" cigars are encompassed by the FDA's definition of premium cigars is unreliable. Indeed, the Undersigned finds no issue with Patel's decision to provide the regulatory definition, compare a sample of the product to the regulatory definition, and review Plaintiff's description of its product before determining Plaintiff's product qualifies as a premium cigar. This methodology -- combined with Patel's extensive tobacco experience -- is more than sufficient.

The next section of Patel's report is titled "Market and Marketing of the Parties'

Products." Plaintiff contends that Patel continues to rely heavily on his unsupported conclusion that "DUO" cigars fall under this non-existent "ultra-premium" category. It continues by claiming that "[t]his section of Mr. Patel's supplemented report, and in fact the entire report, is filled with other similar and unsupported conclusions and assumptions."

As examples of these "unsupported conclusions and assumptions," Plaintiff emphasizes two sentences in Patel's report: (1) a comment that Plaintiff's box of "DUO" cigars "included a repurposed tobacco leaf folded on top of the cigars . . . [to] presumably accentuate the artisanal nature of those premium hand-made cigars" and (2) that "[i]ndustry participants [Patel has] spoken with in the past estimate that at least 50% of premium handmade cigars by dollar volume are sold through the online/mail order sales channel." In Defendants' opinion, Plaintiff's critiques on these comments are best left for cross-examination and Patel's experience is sufficient.

The Undersigned agrees with Defendants, in part. Patel's comment about the presumable purpose behind the leaf being placed in the packaging is an area of inquiry for cross-examination, not exclusion. As Patel indicates, he has substantial experience in the area of marketing these types of products. His assumptions on this subject are fairly made and appropriate for expert testimony.

Patel's hearsay testimony about what industry participants have informed him,

however, is **inadmissible**. This statement is vague, unsupported by any referenced data, and is not presented as a hypothetical or assumed fact. Defendants try to argue this statement is based on his *experience.* But the claim itself reveals that this is inaccurate. Patel is not basing his sales opinion on his *own* experience; he is basing it on the experience of an unknown "industry participant."

Plaintiff avers that the remaining sections of Patel's report, which it characterizes as "Defendants' sales volumes, price points, or channels of trades," are devoid of any expert opinions and address no issues that are beyond the understanding of the average lay person. Defendants' response is that Plaintiff is mischaracterizing Patel's report and that Patel uses that data as a backdrop so that he can "compare[] the market and marketing of Plaintiff's product versus the market and marketing of Defendants' product in view of the most recent FDA/NIH Population Assessment of Tobacco and Health (PATH) study data."

Plaintiff's attempt to characterize Patel's report as a mere recitation of data falls flat and is unsupported by the actual report. Although Patel refers to data surrounding Plaintiff's product and marketing, he does so in order to lead into another section in which he contrasts Plaintiff's apparent marketing strategy with that used by entities marketing mass-market, machine-made cigars.

The Undersigned does not expect the average lay person to have an intimate

understanding of the marketing motivations in the field of premium and machine-made cigars. Patel's opinions on this issue are quintessential expert testimony. *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2021 WL 2592390, at *10 (S.D. Fla. May 12, 2021), report and recommendation adopted in part, No. 17-21087-CIV, 2021 WL 3578011 (S.D. Fla. Aug. 13, 2021) ("When an issue before the court pertains to the effect of a marketing or advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies."); *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 2401647, at * (E.D.N.Y. Sept. 29, 2005) ("Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants.").

The third section of Patel's report addresses the comparisons of the products at issue (i.e., Guantanamera's "DUO" and Swedish Match's "DUOS"). Plaintiff characterizes this section of Patel's report as falling into one of two categories: (1) distinguishing facts between the products which are not in dispute; and (2) an "inexpert, unqualified, and unsupported analysis of the use and meaning of Plaintiff's registered 'DUO' trademark and Defendants' infringing use of 'DUOS.'" Defendants take the position that Plaintiff's arguments amount to little more than factual disagreements with Patel's report and are better left for cross examination.

Plaintiff first argues that Patel's "distinction between premium cigars and

cigarillos" is a "distinction without difference in the context of likelihood of confusion."
This appears to be a relevancy argument. According to Plaintiff, "[t]he United States
Patent and Trademark Office's (USPTO) Trademark Trial and Appeal Board (TTAB) has
specifically found that cigars and cigarillos are legally identical products for the purpose
of a likelihood of confusion analysis." In support of this position, Plaintiff cites *Max Rohr,
Inc. v. Boxer Tobacco Company*, Cancellation No. 92047286, docket entry 10, at p.5 (T.T.A.B.
Sep. 15, 2008).

Plaintiff's reliance on this case -- even if it were germane to the *Daubert* analysis --
is misplaced. Although Plaintiff characterizes the decision as containing an explicit
holding by the TTAB, it neglects to mention that the Boxer Tobacco Company failed to
respond to Max Rohr, Inc.'s allegations. Thus, the TTAB's "finding" was that

> As a preliminary matter, we note that because respondent failed to respond
> to petitioner's requests for admissions, each of the requests is *deemed*
> admitted, and moreover each fact in the requests deemed admitted is
> "conclusively established." Fed. R. Civ. P. 36(a)(3) and (b).
>
> ***
> Respondent has admitted, and the evidence shows, that cigarillos and
> cigars are legally identical products. As Mr. Workman testified, a cigarillo
> refers to a size of cigar. Respondent's admissions, as well as the other
> evidence of record, further establish that that [sic] the goods are sold in the
> same channels of trade to the same classes of purchasers.

*Max Rohr Inc.*, Cancellation No. 92047286, pp. 3, 5 (emphasis added).

Because the TTAB's decision was issued on an uncontested issue and was based

on the specific and unique facts of that case -- which included allegations deemed admitted via default -- the Undersigned does not consider it persuasive authority in support of exclusion. Even if the case were persuasive, Plaintiff's argument on the issue would still be unavailing.

In considering whether there is a likelihood of confusion between two marks, the Eleventh Circuit applies a multifactor test, evaluating the following seven factors:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana v. Dantanna's*, 611 F.3d 767, 774–75 (11th Cir. 2010).

Despite Plaintiff's contentions, this section of Patel's report directly addresses the second, third, and fifth factor[7]. Specifically, Patel compares the ingredients, structure, manufacturing method, and appearances of the two products. Although Plaintiff says that these facts are not in dispute, lack of dispute is insufficient to exclude testimony. The composition of cigars and the differences between the products is a matter outside the knowledge of a layperson.

---

[7]    Both parties agree that much of Defendants' advertising is done at point-of-sale. Thus, depending on the evidence presented, the appearance of the product could have an impact on the Court's inquiry into the fifth factor.

22

However, there are discrete portions of this section of Patel's report that warrant exclusion. Specifically, and for the same reasons mentioned earlier, Patel may not categorize Plaintiff's product as an "ultra-premium" cigar. Second, Patel may not offer this opinion:

> In my experiences, the sophisticated premium cigar consumer would understand the term "duo" is a reference to a "double maduro" cigar either utilizing a "double maduro" wrapper or incorporating two maduro leaves in the construction of the cigar. In my opinion, Plaintiff's use of duo in combination with the name "double maduro" emphasizes the double nature, and that the product is double/duo product, meaning it contains a more full-bodied tobacco leaf wrapper.

Although Patel certainly appears qualified to offer this opinion, he provides no background about his experience that explains the opinion. Instead, he relies on only his *ipse dixit*, which may be sufficient when the experience is obviously sufficient to serve as the sole foundation,[8] but it is insufficient when the basis of the opinion cannot be easily derived from a review of Patel's background.

The rest of Plaintiff's arguments address its disagreements with conclusions and seeming inconsistencies. For example, Plaintiff takes issue with Patel's statements about

---

[8] For example, directly before this opinion, Patel discusses the meaning of the term "double maduro" within the cigar industry. It is obvious to the Undersigned that an individual with more than a decade of experience in an industry would understand industry terminology. To contrast, it cannot be assumed that an individual with experience in an industry will always understand how a member of the *public* would interpret the mark on a cigar if he had no prior experience.

the differences of the products and says that Patel admits his company has sold both products and that other trademark registrations apply to both products -- which Plaintiff argues means that the public can attribute the products to a single source. Plaintiff can address these issues on cross-examination.

In the fourth section of Patel's report, he "compar[es] [] the typical purchasing environment and customer experience." Plaintiff calls this the "least 'expert' section" of Patel's report and refers to his opinion as a "farce." Defendants' arguments in response remain steady: Plaintiff's issues are appropriate for cross-examination, not for exclusion.

In this section, Patel provides the foundational background upon which his opinion is based. After explaining his work with distributors and his visits to "several thousand retail stores," Patel explains the *typical* purchasing experience of premium cigars and compares it to the *typical* purchasing experience of machine-made mass-produced cigars. He describes the environment of the store, the storage of the cigars, the usual placement of the cigars, and the overall customer experience when purchasing cigars, whether premium or machine-made.

Although Plaintiff directly challenges a small section of Patel's report as lacking foundation (despite making a categorical statement that the entire section is unreliable), its main arguments are alleged conflicts in the report and testimony it claims contradicts Patel's findings.

In one of its few specific complained-of portions, Plaintiff attacks Patel's statement that

> it is widely believed that greater than 50% of sales of premium hand-made cigars are generated online. Based on this knowledge, Plaintiff likely secures a large percentage of their [sic] sales through their online store and direct purchase at Plaintiff's Guantanamera cigar lounge, with the remaining sales coming from limited distribution at other boutique tobacco shops.

Defendants' only argument in response is that this matter is best left for cross-examination. I disagree. Patel's statement on this issue lacks sufficient reliability and methodology and does not appear to be based on Patel's experience or knowledge.

Similarly, Patel's statement that "[b]ased on [his] knowledge and experiences, Plaintiff's premium hand-made cigars are not sold in the same locations as mass-market machine-made cigars, and the experience in purchasing Plaintiff's cigars is very personal and tailored to a knowledgeable and discerning smoker" has no stated reliable methodology. Patel admits early on in his report that he has little prior experience with Plaintiff's specific cigar. Thus, while Patel may testify as to the general experience in purchasing a premium cigar, he cannot testify as to the specific experience when purchasing Plaintiff's cigar.

The Undersigned rejects Plaintiff's remaining arguments about contradictions in the report or with other evidence in the case. It may address those issues via cross-examination.

25

In the final section of Patel's report, he discusses the demographics of individuals who purchase premium and economy cigars. Plaintiff agrees that this area is ripe for expert testimony but claims that Patel again turns to his own *ipse dixit* and unsupported conclusions. In reality, Plaintiff's argument is that Patel's opinion focuses on the industry in the abstract and it claims that Patel's report does not address Plaintiff's specific customer base.

This is insufficient to warrant exclusion.

The Court's gatekeeper role is not intended to supplant that of the fact-finder: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (quoting *Daubert*, 509 U.S. at 596) (alterations in original). "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

Patel's opinions in this section are based on sufficient data and experience and sufficiently tied to the facts of the case.

In conclusion, Patel may not offer his opinions: (1) that Plaintiff's "DUO" cigar qualifies as an "ultra-premium" cigar; (2) what "industry participants" have informed

him about sales; (3) how a consumer would interpret the term "duo"; (4) the wide belief about the prevalence of online premium cigar sales; or (5) the usual experience in purchasing Plaintiff's specific product. Plaintiff's motion is denied in all other respects.

b. *Robert Leonard*[9]

Robert Leonard received a Ph.D. in linguistics from Columbia University in 1982. He is a tenured Professor of Linguistics at Hofstra University and has taught linguistics at the college level for nearly 35 years. In addition to his employment as a professor, Leonard provides consulting linguistic services to the FBI, Joint Terrorism Task Force, police, and counter-terrorism units throughout the world.

He has authored, co-authored, and lectured on a variety of topics in the field of linguistics. In addition, he has previously been qualified as an expert in linguistics in multiple federal and state courts.

Leonard was retained by Defendants to "determine if the word 'duos' [defined as "a duet," "a pair," and "two things in close association"] in the disputed use of 'White Owl Duos' shares this semantic and function and thus provides information consistent with these definitions about the product." To accomplish this task, Leonard compared

---

[9]     A copy of Leonard's expert report, including his qualifications, is filed in full on CM/ECF. [ECF No. 164-2]. The Undersigned's summary of Leonard's background and opinions is derived from this exhibit.

two competing hypotheses: (1) "Hypothesis 1: The word 'duos' in White Owl Duos provides information about the product"; and (2) "Hypothesis 2: The word 'duos' in White Owl Duos does not provide information about the product."

As characterized by Plaintiff's and Leonard's conclusion, Leonard's report was meant to "prepare a linguistic analysis to investigate the meaning and usage in American English and American Spanish of the lexical item 'duo(s).'" Plaintiff's opening argument in favor of exclusion is identical to its argument in support of excluding the entirety of Patel's report: Leonard's opinions should be excluded "because they are the product of unreliable methods, unreliable purported evidence, lack data in support, and are not the sort of 'scientific, technical, or specialized' opinions for which expert testimony is appropriate." [ECF No. 164].

Plaintiff's primary argument in favor of excluding Leonard's opinion is that it is a sham opinion meant to contradict Swedish Match's 30(b)(6) representative's sworn deposition testimony that "DUO" and "DUOS" are singular and plural versions of the other and their primary meaning is "two people singing together." As fallback arguments, Plaintiff contends that Leonard's report is unreliable because (1) he did not consider a Swedish Match focus group or a marketing agency PowerPoint; (2) he deviated from the Meriam-Webster definition of the word duo; (3) he "smuggled" in irrelevant uses of the term "duo"; and (4) Leonard's analysis does nothing to enlighten the Court to

the issues.

None of these arguments are persuasive. Indeed, as Defendants note in their response, most of Plaintiff's complaints are fodder for cross-examination, not exclusion.

Plaintiff first takes issue with Leonard's conclusion, which is summarized as follows: "the word 'duos' in White Owl Duos provides information about the product . . . [and] this use is similar to other third-party uses of 'duo' (and related variants) in product names." According to Plaintiff, this conclusion is Defendants' attempt to recover from the following deposition exchange with Swedish Match's 30(b)(6) representative:

Q: What's the primary meaning of DUOS in your mind?

A: Two people singing together.

Q: Is DUOS the pleural [sic] of the word "DUO"?

A: Yes

Q: Do you think the word "DUO" and "DUOS" have the same meaning?

A: As I said, one is the pleural [sic], yes.

Plaintiff says this exchange has bound Defendants to this definition because one of the 30(b)(6) topics was "[t]he similarity of meaning between 'DUO' and 'DUOS.'" Plaintiff cites two cases for the proposition that an expert cannot contradict a party's testimony. Neither case, however, furthers Plaintiff's argument.

In *In re Knickerbocker*, 827 F.2d 281, 289 (8th Cir. 1987), the expert's testimony was

not admitted for *many* reasons, including that his estimation of production costs had flawed methodology and contradicted the facts witness' testimony of the actual production costs. The Court did not rely on any type of flat-out legal rule holding that an expert's opinion could *never* contradict the testimony of the party whose law firm retained the expert.

Moreover, the appellate court ultimately held that the expert's testimony about future revenues was not so speculative and conjectural as to render it insufficient to support a damages award, Therefore, it vacated the trial court's order granting the defendant's motion for a j.n.o.v., finding that there was evidence from which the jury could have derived a lost profits award -- by comparing the Knickerbockers' own testimony about production costs and land set asides with the expert's testimony about projected revenues.

Plaintiff's second case warrants even less consideration. In *Arnold v. Krause, Inc.,* 233 F.R.D. 126, 130 (W.D.N.Y. 2005), contrary to Plaintiff's assertion, there was no ruling on the issue for which Plaintiff cites the case. Although the defendant in that case argued that the expert's testimony contradicted the plaintiff's testimony, it did so as evidence of prejudice justifying exclusion based on a late disclosure. Thus, the ruling was on the prejudice conferred by the late disclosure of a report, not on the contradictions within the report.

Defendants briefly respond to Plaintiff's contention and state that this was an improper line of questioning, and that the answer was merely the personal opinion of the witness. However, the Undersigned need not address that issue. Regardless of whether the 30(b)(6) answer was a personal opinion of the designee or a binding declaration by Swedish Match, the answer does not address the salient inquiry or render Leonard's report irrelevant or contradictory.

In trademark disputes, the distinctiveness inquiry is based on how the consumer would interpret the logo or the product, not the manufacturer. *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1523 (11th Cir. 1991) ("[S]uggestive term suggests the characteristics of the service and requires an effort of the imagination *by the consumer* in order to be understood as descriptive . . . . Also probative of the descriptiveness of a mark is the idea that is conveyed *to the observer* by the plain dictionary definition of the formatives comprising the mark." (emphasis added)); *Engage Healthcare Commc'ns, L.L.C. v. Intellisphere*, L.L.C., 792 F. App'x 178, 187 (3d Cir. 2019) ("It would be readily apparent *to the average consumer* that "Peer-Spectives" stands for "Peer Perspectives." (emphasis added)).

Leonard's opinion addresses the consumer perspective issue and Plaintiff makes no attempt to argue that this is not the proper consideration in its Reply. Thus, it is of no consequence for purposes of admissibility that the 30(b)(6) representative gave this

testimony, even if it constitutes proper evidence of Swedish Match's state of mind (which is an issue not currently before the Court).

Plaintiff's next two arguments -- the failure to consider the focus group study or the PowerPoint and the improper weight given to the certain dictionary definitions -- are both fact-based attacks on Leonard's report. Specifically, Plaintiff claims that Leonard's report is unreliable because (1) it did not reference a Swedish Match focus group in which 50% of participants did not realize there were two cigars in the packaging; (2) it did not reference an internal marketing PowerPoint slide depicting a singing couple as a "duo" example; and (3) it deviated from the Meriam-Webster and American Heritage definitions.

Plaintiff and Defendants argue at length about the factual specifics of the focus group and PowerPoint, and each alleges the other side has misrepresented the data. However, the Undersigned need not address these issues because it is a well-settled view that Plaintiff's arguments are insufficient grounds to exclude expert testimony. *See* Fed. R. Evid. 702 Advisory Committee Note ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most

cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

These types of complained-of flaws (if they even are flaws in the first place) are similar to the "flaw" addressed in *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345, where the Eleventh Circuit upheld the district court's decision to admit evidence challenged as "fail[ing] to use the proper equation" and "that the specific numbers [the expert] used were wrong" because these types of "alleged flaws in [an expert's] analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods."

Just as in *Quiet Tech* and other cases where a party has cried foul over the data considered, Plaintiff can address on cross-examination the importance of the focus-group study, the PowerPoint presentation, and the dictionary definitions.

Plaintiff's next argument focuses on data it claims Leonard should not have considered -- use of the term "duo" on non-cigar related products and businesses. As part of Leonard's analysis, he examined products where he determined a company used the word "duo" to describe the fact that the product had two of something (i.e., two uses, two flavors, two features, etc.). Plaintiff refers to these references as unauthenticated and irrelevant.

Both of Plaintiff's arguments on this issue are unpersuasive. Certainly, Plaintiff

33

can question Leonard on his knowledge of these products and how they are advertised or made available. But Plaintiff has provided no authority that Leonard must include in his report information about whether he purchased, used, or personally viewed the product. Indeed, the law does not require this level of detail in expert reports. *Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 6729362, at *7 (S.D. Fla. Nov. 16, 2020) ("Rule 26(a)(2)(B) does not require that a report recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*. Nor does it require the expert to anticipate every criticism and articulate every nano-detail that might be involved in defending the opinion on cross examination at a *Daubert* hearing.") (internal quotations omitted)).

The Undersigned also rejects Plaintiff's unelaborated relevancy argument. Leonard details his methodology in his report and explains that part of the process is to examine the manner in which the word is used in a culture. This falls in line with that methodology.

Plaintiff's final argument is that Leonard's report does nothing to enlighten the Court as to any of the issues in this case. Plaintiff explains that "descriptive" and "suggestive" are legal terms and "the ultimate question is not whether "DUOS" . . . is capable of conveying information about the product to the consumer." Although it is accurate to say that "descriptive" and "suggestive" have legal meanings, whether

34

something is "descriptive" or "suggestive" is a question of fact. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) ("Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness.").

The manner in which the public interprets the word "duo" or "duos" is directly relevant to the case -- and possibly the *primary* issue in the case. By Plaintiff's own logic, here, it is entirely irrelevant whether the public could glean any information from a mark. If accepted, then this reasoning would render the focus group evidence and 30(b)(6) testimony that Plaintiff repeatedly references in its pleadings also irrelevant to any of the issues. Plaintiff's argument on this point is nothing more than an argument on the merits of the case masquerading as a *Daubert* request.

Accordingly, Plaintiff's motion about Leonard is denied in its entirety.

    c.   *Charles Taylor*[10]

Charles Taylor is a Professor of Marketing at Villanova University with a Ph.D. in Marketing from Michigan State University. He has published more than 100 articles in peer-reviewed academic journals and served in leadership roles for multiple marketing/advertising entities. He is primarily interested in the research areas of advertising and legal issues in marketing, including the marketing of alcohol and

---

[10]   A copy of Taylor's expert report, including his qualifications, is filed on CM/ECF. [ECF No. 167-2]. The Undersigned's summary of Taylor's background and opinions is derived from this exhibit.

tobacco. In the tobacco field, he has published journal articles, produced conference papers, and lectured on topics related to tobacco marketing.

Taylor was retained to offer opinions on the following topics:

1. Assessing informational and promotional uses of "duo".

2. Assessing the brand equity of White Owl.

3. Importance of the differences in marketing, demographics, and consumer behavior as it pertains to mass-market and premium cigars; and

4. Impact on internet searching and purchasing behavior for the parties' products.

Plaintiff begins by levying the same accusation against Taylor that it did against Defendants' other experts: Taylor's opinions should be excluded "because they are the product of unreliable methods, unreliable purported evidence, lack data in support, and are not the sort of 'scientific, technical, or specialized' opinions for which expert testimony is appropriate." [ECF No. 167]. Similarly, many of the substantive arguments made are identical to those asserted in Plaintiff's other *Daubert* motions.

Plaintiff's arguments can be summarized as follows: (1) Taylor's report is an attempt to offer an improper legal conclusion; (2) Taylor's report contradicts Swedish Match's 30(b)(6) testimony; (3) Taylor failed to consider certain evidence, considered unreliable evidence, and made incorrect statements; (4) Taylor's marketing, demographics, and consumer behavior section is based on unsound principles and facts;

36

and (5) Taylor's Internet search is unreliable.

To begin, Plaintiff's motion is largely devoid of specific attacks on discreet opinions (as opposed to the underlying evidence or facts). Likewise, other than its standard of review section, the motion is also largely devoid of any substantive legal analysis and, at times, reads more like a closing argument than a *Daubert* motion. Plaintiff rarely addresses or articulates alleged deficiencies in the methodology or explains what makes the evidence unreliable beyond stating that it believes the data to be unreliable.

The majority of Plaintiff's arguments are akin to requesting exclusion of an expert because another expert reached a contrary conclusion. That is not a legitimate argument, nor is it sufficient to preserve arguments. The role of the Court is not to read through a report and identify for itself flaws and impermissible conclusions. If Plaintiff thinks there is an improper legal conclusion, then it must identify the legal conclusion; merely giving one example of a purported legal conclusion and then requesting wholesale exclusion of the entire report is insufficient to preserve an argument beyond the identified portion.

Because Plaintiff's bases for exclusion overlap across different sections of Taylor's report, I will organize this section of the Order by legal grounds, rather than by section.

i.   Legal Conclusions

Plaintiff argues that Taylor's "report is an attempt to supplant the role of the Court and to offer improper legal conclusions." It provides the following illustration of a

purported impermissible legal conclusion within Taylor's report:

> [a] key issue in this case is whether Swedish Match's use of the term 'Duos' is used for descriptive and informative purposes as opposed to as a part of a brand name. Based upon my research and investigation it is my opinion that Swedish Match's White Owl brand is using the word 'duos' in the context of its marketing efforts to refer to two, or a pair, of cigarillos, and not as a brand name designed to differentiate itself from its competitors and build brand equity.

In support of its position, Plaintiff cites a single case, *N. Palm Motors, LLC v. Gen. Motors LLC*, No. 9:19-CV-80872, 2020 WL 6384308, at *3 (S.D. Fla. Oct. 30, 2020), with no analysis or discussion of the holding. A review of the case reveals it offers little support for Plaintiff's argument other than to explain the unremarkable principle that a legal conclusion is an impermissible topic for an expert.

This lack of specific legal support (through the citation of precedent or other case law authority) is unsurprising. As mentioned earlier in this Order, it is well settled that the issue of distinctiveness is a question of fact. *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1084 (11th Cir. 2016) ("Distinctiveness and [t]he existence of secondary meaning" are "question[s] of fact."); *Welding Servs., Inc.*, 509 F.3d at 1357 ("Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness."); *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1559-60 (11th Cir. 1991) ("Both the distinctiveness categorization and the existence of a secondary meaning are questions of fact.").

ii.   30(b)(6) Deposition

Plaintiff repeats its belief that Swedish Match's 30(b)(6) witness' deposition testimony bound Defendants to the "fact" that duo or duos means two people singing and Taylor's report seeks to contradict this testimony. The Undersigned rejected this argument as applied to Leonard and rejects it again for the same reasons here.

iii.   Evidence Consideration

Most of Plaintiff's requests for exclusion focuses on Taylor's consideration/non-consideration of evidence. Specifically, Plaintiff complains that (1) Taylor did not use his own focus group or consider record evidence of Swedish Match's focus group and deposition testimony from advertising agency; (2) Taylor's report is based on faulty evidence; and (3) Taylor misrepresents Defendants' and Plaintiff's products' appearance. Defendants aver in response that, like many of Plaintiff's other arguments, these arguments go to the weight of the testimony, not its admissibility.

Plaintiff's unmet desire for Defendants' experts to consider and reference Swedish Match's focus group or the testimony of an advertising executive is insufficient to warrant exclusion. Plaintiff has presented no legal or evidentiary basis supporting the principle that a marketing expert *must* reference focus groups in his opinion or that focus groups are the *only* acceptable foundation for a marketing opinion. The only thing before the Court is unsubstantiated attorney argument that a marketing expert should consider

these things. This is insufficient to justify exclusion.

In this same vein, Plaintiff complains that Taylor allegedly incorrectly opined that "[t]he term 'Duos' is never used alone on Swedish Match products; as part of the company's strategy it is always used in conjunction with the White Owl brand name . . . ." After quoting the sentence, Plaintiff references photos which purport to show the "DUOS" mark sans White Owl brand (with no evidence that the expert has viewed these photos) and argues that the expert is wrong. Certainly, this could be a powerful point to make during cross-examination. But it is not sufficient to support a ruling of exclusion.

Plaintiff levies similar complaints elsewhere in its motion, complaining about Taylor's use of the word elaborate to describe Guantanamera's "DUO" packaging, the prominence of the term "DUO," and the connection to Cuba via use of old-style lettering.[11] These arguments are unpersuasive for the same reasons Plaintiff's other fact-based attacks have been found unpersuasive.

Plaintiff then moves on to Taylor's consideration of purportedly unreliable

---

[11]    The Undersigned is uncertain why Plaintiff is even contesting this statement. As can be noted in Patel's report, Plaintiff's website characterizes its DUO cigars using some of the following descriptors: "handmade . . . by skilled *Cuban* Master cigar rollers," "hand made with *Cuban*-seed Habano long-fillers . . . blended with . . . *Cuban*-seed Habano Ligero," "Guantanamera DUO is a magnificent premium cigar with a sophisticated *Cuban* taste." [ECF No. 163-2]. In sum, it seems obvious that Plaintiff is attempting to connect Cuba to its product. An affirmation of this fact by an expert hardly seems problematic.

evidence. For example, in Plaintiff's view, Taylor's reliance on websites to demonstrate evidence that other tobacco companies used the term "duo" or "duos" on their products is not credible because he did not engage in due diligence into each website, which Plaintiff says renders the list inadmissible and irrelevant. Although Plaintiff distinguishes between products Taylor purchased and those which he only discovered online, the Undersigned need not address whether that distinction is germane. This is because Plaintiff has cited no law supporting its position.

This fact was brought to Plaintiff's attention in Defendants' response. However, in Plaintiff's Reply, rather than provide pertinent legal authority, it continued to make fact-based arguments on why it believes certain evidence is unreliable and cite general *Daubert* principles. In fact, the only legal authority it cites on this issue was provided by Defendants, *CareFirst of Md v. First Car*e, 434 F.3d 263, 270 (4th Cir. 2006), which allowed evidence of web-page printouts. Plaintiff argues this case is distinguishable but, after attempting to do so, provides no authority that its preferred principle -- exclusion without web-page printouts -- is legally sound.

"A party's failure to cite legal authority in support of its position 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, No. 16-21831-CIV, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017) (quoting *Rapid Transit Lines, Inc. v. Wichita*

*Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)). The Court declines this invitation and rejects Plaintiff's argument based on the complete lack of legal authority. *See United States v. Heijnen*, 215 F. App'x 725, 726 (10th Cir. 2007) (rejecting the appellant's arguments for failure to provide supporting legal authority); *Anderton v. Avery Fin. Servs.*, No. 4:10–cv– 00392–EJL–CWD, 2011 WL 4584979, at *6 (D. Idaho Aug. 23, 2011) (same); *Crews v. Sara Lee Corp.*, No. 08–CV–113–LRR, 2009 WL 909236, at *1 (N.D. Iowa Mar. 31, 2009) (same).

As another complaint over Taylor's factual considerations, Plaintiff argues that Taylor compared the wrong White Owl products. In Taylor's report, in support of his view that "DUOS" is meant to inform the consumer that there are two cigars, he points to the existence of other White Owl products he claims have descriptive titles: Minis (small cigars), Swirls (mixed color wraps), Blunts (small cigars), and Sweets (sweet tobacco). In Plaintiff's opinion, Taylor should have compared "DUOS" to the following White Owl products: Firecracker and Silver.

As before, Plaintiff offers no legal argument as to why this warrants *exclusion*. Instead, it provides the legal definition of a descriptor and then makes conclusory attorney argument that "DUOS", Firecracker, and Silver are not descriptors. The Court will not do Plaintiff's legal research for it, nor will it accept Plaintiff's "these facts are better" argument as a basis for exclusion.

iv.   <u>Methodology</u>

42

Taylor's report suffers from one of the same methodologic flaws present in Patel's report. As Plaintiff notes, Taylor also characterizes Plaintiff's cigars as "ultra-premium" or "super-premium." This is impermissible for the same reasons Patel may not offer a similar opinion.

In its only other methodology-focused argument, Plaintiff seeks exclusion of Sections 3(c) through 3(f) of Taylor's report. It claims that these opinions rely on nothing more than Taylor's *ipse dixit*. As Defendants note in their response, Taylor bases these opinions on his experience. However, Defendants do not explain what in Taylor's experience justifies his opinions on the subject.

Experience, when properly explained, may be sufficient. For example, in Section 3(c), Taylor offers an opinion on retail stores and displays. One of Defendants' other experts, Patel, opined on a similar subject. In Patel's opinion, he says it is based on his visits to thousands of these stores and his meetings with multiple distributors. In Taylor's opinion, he says it is "[b]ased on his experience and knowledge." Patel's experience is clearly sufficient. Taylor's experience may or may not be sufficient.

Defendants' response does very little to provide any information about how Taylor's experience enables him to offer these opinions. Likewise, however, Plaintiff does very little to explain why Taylor's experience is insufficient. Many of Plaintiff's complaints might be better illuminated had it had chosen to take a deposition. But

instead, Plaintiff has chosen to seek blanket exclusion based solely on the report, which isn't required to have the level of detail Plaintiff desires. *Kleiman*, 2020 WL 6729362, at *7.

At bottom, neither side has made a compelling argument in support of exclusion or admission. Therefore, this portion of Plaintiff's request is **denied without prejudice**. Before Taylor testifies about the opinions contained in Sections 3(c)-(f), Plaintiff may *voir dire* him on the issues. *Travelers Prop. Cas. Co. of Am. v. Barkley*, No. 16-61768-CIV, 2017 WL 4867012, at *1 (S.D. Fla. June 2, 2017) ("Where a trial judge conducts a bench trial, the judge need not conduct a Daubert (or Rule 702) analysis before presentation of the evidence, even though [s]he must determine admissibility at some point." (quoting *Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016)).

In sum, Plaintiff's motion is **denied in part**, **denied without prejudice in part**, and **granted in small part**. Taylor may not use the terms "super premium" or "ultra premium" in reference to a category of cigars and Plaintiff is permitted to *voir dire* Taylor before he offers any of the opinions contained in Sections 3(c)-(f) and may again raise that limited objection during trial.

## IV.    CONCLUSION

Based on the foregoing, the Undersigned Orders as follows:

(1) Plaintiff's Motion to Exclude Rushabh Patel's testimony is **granted in part and denied in part**. Patel may not offer his opinions: (1) that Plaintiff's "DUO" cigar

qualifies as an "ultra-premium" cigar; (2) what unidentified "industry participants" have informed him about sales; (3) how a consumer would interpret the term "duo"; (4) the so-called wide belief about online premium cigar sales; or (5) the usual experience in purchasing Plaintiff's specific product. Plaintiff's remaining requests are **denied**;

(2) Plaintiff's Motion to Exclude Robert Leonard's testimony is **denied**;

(3) Plaintiff's Motion to Exclude Charles Taylor's testimony is **denied in part, denied without prejudice in part, and granted in small part**. Taylor may not use the terms "super premium" or "ultra premium" in reference to a category of cigars and Plaintiff is permitted to *voir dire* Taylor before he offers any of the opinions contained in Sections 3(c)-(f) and may again raise that limited objection during trial.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on April 20, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record