UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-cv-21714-GOODMAN
[CONSENT]

GUANTANAMERA CIGARS COMPANY,
a Florida corporation,

      Plaintiff,

v.

SMCI HOLDING, INC., et al.,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

"Close, but no cigar" is a phrase which means that a person's effort to achieve

something fell short and therefore did not produce a reward. It most likely originated in

the 1920s, when fairs or carnivals would hand out cigars as prizes. The words were said

when the player failed to win a carnival game.[1] The figure of speech could also apply to

Plaintiff's lawsuit, in which a small, local cigar company unsuccessfully pursued claims

against a much-larger cigar company for alleged infringement of a trademark it held for

its cigars. Although the Plaintiff cigar company was able to establish two of seven factors

---

[1]     Mariana Heredia, *What Do "Close But No Cigar" and 3 Other Sayings Mean?* (June 2, 2023), https://cigarcountry.com/close-but-no-cigar-phrase/.

used to determine whether there is a likelihood of consumer confusion among cigar customers, it failed to tip the scales in its favor and therefore does not prevail.

This conclusion arises after a bench trial, which was held from March 6 through March 9, 2023. [ECF Nos. 274; 276; 278; 281]. Plaintiff, Guantanamera Cigars Company ("Plaintiff" or "GCC"), asserted claims for infringement of a federally registered trademark under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), and common law trademark infringement over the trademark "DUO" -- United States Trademark Registration No. 3,664,534. [ECF No. 1]. Defendants SMCI Holding, Inc., Swedish Match North America, LLC, Swedish Match USA, Inc. (collectively, "Swedish Match"), Sam's West, Inc. ("Sam's Club"), and Costco Wholesale Corporation ("Costco") (collectively, the "Defendants") counterclaimed for declaratory judgment of non-infringement and fair use. [ECF No. 36].

Having presided over this matter in a bench trial and having reviewed the parties' post-trial submissions and the record, in accordance with Fed. R. Civ. P. 52(a), the Court outlines the facts in detail and analyzes the applicable legal doctrines.[2]

---

[2]     Any findings of fact that are more properly considered conclusions of law are so deemed. Any conclusions of law that are more properly viewed as findings of fact are so deemed.

## I.   SUMMARY OF OPINION

This case involves the Defendants' purported infringing use of Plaintiff's DUO mark. The parties each manufacture and sell tobacco-related products. However, the similarities between the parties' products, consumers, and marketing shares little else in common. GCC sells a line of premium, hand-made, Cuban-style cigars under its DUO mark for nearly $14 each. Swedish Match briefly manufactured and sold a line of mass-market, artificially-flavored, machine-made cigarillos, sold in packs of two in a foil pouch, under the famous WHITE OWL house mark, using the descriptor "duos." WHITE OWL duos sold for 50 cents each.[3]

To prevail on its claims -- which are all grounded in trademark infringement -- GCC needed to prove that Swedish Match's use of duos was likely to confuse the GCC DUO cigars with WHITE OWL's duos cigarillos. The parties presented evidence on the multi-factor approach generally employed when evaluating likelihood of confusion. Weighing the evidence and each of these factors in totality, the Court concludes that consumers would **not** have been likely to be confused into thinking that the Swedish Match WHITE OWL products with the descriptor "duos" came from GCC. Analysis under the seven-factor approach (taking the factors in *reverse* order) is briefly summarized below.

---

[3]     Swedish Match no longer sells WHITE OWL duos.

GCC concedes that it has no evidence of even a single instance of *actual* confusion, which is often cited as among the most important of the seven factors. GCC did not provide any survey evidence or expert witness testimony concerning actual confusion or even a likelihood of confusion. Given the length of time that the parties' products co-existed and WHITE OWL duos' ample sales figures, the Court would certainly expect evidence of actual confusion if any consumers were actually confused. But there was none.

Swedish Match launched its WHITE OWL duos cigarillos in April 2020. WHITE OWL duos were widely promoted in numerous trade publications and the company won a prestigious industry award. The company sold nearly 36 million duos cigarillos over the following year. WHITE OWL duos were sold primarily in 75,000 convenience stores and gas stations across the country, including many here in Miami-Dade County, and Swedish Match actively promoted the product on its website from the initial launch.

Plaintiff's failure to come forward with evidence of actual confusion is not from a lack of effort. The president and founder of GCC testified that he and his lawyers actively monitored the marketplace for potential infringers of its DUO mark. The president also testified that he had continuous, daily interactions with his customers, and that he had personally visited convenience stores and gas stations on almost a weekly basis throughout the relevant time period. Yet, he admitted that he first learned of WHITE

OWL duos cigarillos only through his attorneys in April 2021, a year after their introduction. This factor weighs in favor of Swedish Match.

There is also no evidence that Swedish Match intended to trade on GCC's goodwill. Swedish Match chose the descriptor "duos" before it knew of GCC. And while it ultimately learned of GCC's DUO mark, it launched its own product *despite* GCC's trademark, not *because of* the mark. Further, Swedish Match's research efforts into the use of the word duo or duos in other non-tobacco products undermines any argument that Swedish Match selected the duos descriptor knowing that it would violate GCC's trademark. The "intent" factor favors Swedish Match.

There are substantial differences between the types and channels of advertising and the parties' products' respective channels of trade. GCC's print media advertising is minimal at best and does not overlap with Swedish Match's. GCC presents itself and its Guantanamera DUO cigars as high-end, premium Cuban-style cigars and targets its limited advertising and marketing efforts towards knowledgeable cigar aficionados. Swedish Match, in contrast, relies primarily on point-of-sale marketing in targeting its budget-conscious consumer base, and it ties all product branding to its own WHITE OWL mark. GCC sells primarily from its "Little Havana" location in Miami and its own website, whereas Swedish Match sells almost exclusively in third-party convenience stores and gas stations. The trade and advertising channel factor favors Swedish Match.

Plaintiff, however, prevails on the similarity-of-goods factor. Although Defendants focus on the difference between the parties' products, the Court's consideration of this factor must focus instead on whether the public could believe that both products originate from the same source. Defendants' own expert testified that his own tobacco company produces both premium cigars as well as machine-made cigarillos. This factor favors Plaintiff.

The overall commercial impression -- i.e., the similarity between the two marks -- that each party's goods present to consumers is also vastly different. As mentioned, GCC markets its high-end and expensive Cuban-style premium cigars to aficionados in premium cigar shops. The products are sold in old-style wooden cigar boxes. No price information is included on the packaging. The cigars themselves tend to be very large and are designed to be stored in humidors. GCC describes its products as "ultra-premium" and touts the use of the finest tobaccos without artificial flavoring. GCC's product packaging is subdued and classic, with muted colors and highly stylized scripts.

In stark contrast, Swedish Match sold its WHITE OWL duos cigarillos in a bright-colored foil pouch, emphasizing the artificial flavoring and low price. The products are not stored in a humidor, but rather behind the counter at gas stations, requiring consumers to ask for them by name. The considerable differences in the ways that consumers encounter the parties' respective products favors Swedish Match.

The final consideration, the strength of the mark, favors Plaintiff -- based solely on its status as an incontestable mark. The Eleventh Circuit provides marks which have become incontestable with a presumption that the mark is, at a minimum, descriptive with a secondary meaning. Although the Undersigned would conclude differently based on an independent evaluation of Plaintiff's mark, Defendants failed to rebut the presumption, which means the Court must find that Plaintiff's mark is a *relatively* strong mark.

In summary, five of the factors favor Swedish Match and two of the factors favor GCC. Although determining whether an intellectual property plaintiff has established a likelihood of confusion requires more than a formulaic tallying of the factors, the majority of the factors favor Defendants, and the evidence has convinced the Court that there is no likelihood of confusion. Therefore, GCC is not entitled to any relief.

## II.   FINDINGS OF FACT[4]

### A.  The Parties

1.      GCC is owned and run by Jose Montagne. Mr. Montagne emigrated from Cuba in 1996, and now operates a boutique cigar café in the Little Havana neighborhood of Miami, Florida. Day 1 Tr. 6:14-17, 12:5-14. In addition to buying cigars, visitors can also

---

[4]      The findings of fact rely, in part, on the testimony presented at trial. The transcripts from the trial are on CM/ECF, which the Undersigned will abbreviate, as follows: (1) [ECF No. 280] -- "Day 1 Tr."; (2) [ECF No. 283] -- "Day 2 Tr."; (3) [ECF No. 287] -- "Day 2 Tr.2"; (4) [ECF No. 308] -- Day 3 Tr."; and (5) [ECF No. 309] -- "Day 4 Tr."

purchase Cuban food and drinks and other cigar-related accessories and products. Day 1 Tr. 25:6-18; Day 2 Tr. 16:2-17:3; 44:6-15; 66:2-14.

2.      The Swedish Match Defendants are part of an international corporate group that sells, among other products, machine-made cigarillos. In the United States, Swedish Match sells and competes in the "Mass Market Cigar" category under its WHITE OWL brand and Arctic Owl design, which have been in continuous use in the United States for more than 130 years. Day 3 Tr. 132:16-133:14. The WHITE OWL brand serves as a flagship for several other Swedish Match product lines as well, including Swedish Match branded WHITE OWL Minis, WHITE OWL Swirls, and WHITE OWL Black Sweets. Day 3 Tr. 133:15-18. The president of GCC admitted that the WHITE OWL brand is well known and famous. Day 2 Tr. 77:7-12.

3.      Defendant Costco was a retailer of Swedish Match's WHITE OWL duos cigarillos. While Costco has sold both premium and non-premium cigars, it has never sold any of GCC's premium cigars. [ECF No. 264, ¶5(QQ)].

4.      Defendant Sam's Club was a retailer of Swedish Match's WHITE OWL duos cigarillos. While Sam's Club sold both premium and non-premium cigars, Sam's Club has never sold any of GCC's premium cigars. *Id.* at ¶5(PP).

### B.  The Underlying Facts

5.      GCC sells a line of premium, handmade, unflavored cigars under the "DUO" mark, which are closely connected to its "Guantanamera" house mark. [ECF No. 264, ¶5(OO, Y)].

6.      GCC sells its premium cigars under three product lines: "Guantanamera," "310," and "Duo." Day 1 Tr. 17:1-4.

7.      Swedish Match sold a line of mass-market, artificially flavored, machine-made cigarillos under its famous WHITE OWL brand using the descriptor "duos" from April 2020 until the end of August 2021. Day 3 Tr. 182:13-19.

8.      The WHITE OWL duos product received the Best New Product award for 2020 from the CSP Retailer Choice Best New Products Contest. Day 4 Tr. 199:24–201:9; [ECF No. 294-16].

9.      Swedish Match sold nearly 36 million WHITE OWL products bearing the "duos" descriptor from April 2020 to April 2021. Day 3 Tr. 199:15-17. The products were sold from more than 75,000 convenience stores across the country, including in Miami, Florida. Day 3 Tr. 150:19-151:4.

10.     Mr. Montagne visited convenience stores in Miami regularly during 2020 and 2021 and keeps abreast of everything going on in the cigar market. During those visits, Mr. Montagne never saw a WHITE OWL duos product for sale, nor encountered any point of sale or other advertising concerning the WHITE OWL duos product. Mr.

Montagne learned about Swedish Match's sale of WHITE OWL duos products from his attorneys in April 2021. [ECF No. 264, ¶5(J)]; *see also* Day 2 Tr. 81:19-24.

11.    Mr. Montagne interacted with customers at GCC's store in Miami on a daily basis. Day 1 Tr. 10:16-11:6. Mr. Montagne did not testify that any of those customers, or any other person, expressed any confusion over the two products.

12.    GCC sent a cease-and-desist email to Swedish Match on April 19, 2021. [ECF No. 264, ¶5(K)]. GCC did not introduce any evidence of further communications with Swedish Match following the sole cease-and-desist email. GCC filed the Complaint on May 4, 2021. [ECF No. 264, ¶5(L)].

13.    GCC did not present any evidence of actual damages or lost sales. [ECF No. 264, ¶5(RR, SS, UU)]. GCC is seeking only to disgorge the profits of Swedish Match. [ECF No. 195, p. 28].

14.    Swedish Match no longer sells, and does not intend to sell, any products using the word "duos" (or "pairs") on packaging. Day 3 Tr. 227:3-5.

### C.  Likelihood of Confusion Factors

Factor 1 - Distinctiveness/Strength of GCC's "Duo" Mark

15.    The term "duos" means "two" or a "pair," often referring to two complementary things. Day 4 Tr. 141:5-11. English and Spanish language dictionaries define "duo" to mean, among other things, two of something or a pair. [ECF No. 264, ¶5(AA, CC, DD)].

16.     There is widespread use of "duo" and "duos" on a variety of consumer goods, which describe aspects of the products. Swedish Match introduced evidence and expert testimony that "duo" and "duos," were used by more than 50 third-parties on consumer goods, in both tobacco/smoking related fields and non-tobacco fields. Day 4 Tr. 122:16-124:12; [ECF No. 294-24-74]. Dr. Charles R. Taylor, Defendants' marketing expert, identified 20 tobacco/smoking related consumer goods and 32 other consumer goods, each of which used "duo" or "duos" on their packaging. Day 4 Tr. 123:3-9. Although the testimony was unrebutted, the Undersigned finds that there are multiple analytical gaps (which will be explained below) undermining the value of this testimony.

17.     Examples of tobacco/smoking related consumer goods using "duo" or "duos" included: Bevs & Burns Lavish Duo [ECF No. 294-39], Bevs & Burns Dreadful Duo [ECF No. 294-33], Dominican DUO (D184), OHM DUO [ECF No. 294-40], Philip Morris IQOS 3 DUO [ECF No. 294-26], Davidoff Punch Cutter 'DuoCut' [ECF No. 294-36], and Winston XS Plus DUO [ECF No. 294-27]. Day 4 Tr. 123:10-21, 140:12-23.

18.     Examples of non-tobacco/non-smoking related consumer goods using "duo" or "duos" included: DUO Security (by Cisco) [ECF No. 294-50], Old Spice Swagger Duo [ECF No. 294-72], Keurig K-Duo [ECF No. 294-46], KitKat DUOS [ECF No. 294-51], Starburst DUOS [ECF No. 294-53], Cheez-It DUOZ [ECF No. 294-56], and Belvita Breakfast Duo [ECF No. 294-55]. Day 4 Tr. 140:2-14, 179:4-12.

19.     As Dr. Taylor testified, in each instance "duo" was used to mean "two or a pair of something"; "[s]ometimes dual function, sometimes two flavors, but two of something." Day 4 Tr. 124:2-12. Dr. Taylor testified that, in his opinion, "duo" is a commonly-used term to describe or indicate two of something across a multitude of consumer goods. Day 4 Tr. 141:5-11. GCC offered no expert testimony or evidence to rebut the testimony or opinions offered by Dr. Taylor.

20.     Although Mr. Montagne testified that "DUO" is entirely unrelated to the characteristics of the product, Day 1 Tr. 67:13-25, 68:1-4, the Undersigned does not find this testimony credible.

21.     In early 2019, Swedish Match decided to offer two complementary flavored cigarillos in a single package. Day 3 Tr. 175:24-176:2; *see also* [ECF No. 231-1, 47:25-48:6]. Swedish Match sought out a common English word to inform consumers that each package included two complementary-flavored cigarillos. Day 3 Tr. 175:13-23.

22.     Before its introduction of the products at issue, Swedish Match had not sold a product containing two different flavored cigarillos in the same pouch. Day 3 Tr. 165:17-22. Swedish Match chose to use the descriptor "duos" on its new WHITE OWL product to inform end consumers that this new product included two different-flavored cigarillos in the same pouch. Day 3 Tr. 175:13-23; *see also* [ECF No. 231-5, 72:17-73:2].

23.     Swedish Match's Vice President of Marketing, Brian Love, was responsible for the selection and was aware, at the time, of numerous uses of the word "duo" and

"duos," and variations thereof, on a variety of consumer products, including tobacco products, food products, and other consumer goods. Day 3 Tr. 195:19-196:2. Mr. Love has more than 30 years of experience in marketing consumer products, including more than 16 years with Swedish Match in marketing and promoting various tobacco products. Day 3 Tr. 121:20-122:8.

24.     Swedish Match's WHITE OWL duos products were offered in a single foil pouch featuring two complementary flavored cigarillos, such as coconut and rum, mango and pineapple, and strawberry and lemonade. Day 3 Tr. 175:15-18; *see also* [ECF No. 264, ¶5(H, FF)].

25.     Swedish Match chose the descriptor "duos" "to communicate the fact that there were two different flavored cigars in a single pouch," and the packaging was designed with certain visible cues to further reinforce this fact to the end consumer at the point of purchase. [ECF No. 231-1, 34:18-24; 38:22-25].

26.     Swedish Match introduced testimony and contemporaneous documentary evidence establishing that it was aware of numerous third-party uses of the terms "duo," "duos," and similar variations, in connection with various consumer goods at the time it chose to use the descriptor "duos" in connection with the products at issue. Day 3 Tr. 195:2-196:2; 268:14-269:1; *see also* [ECF No. 294-20]. The information was gathered, in part, to "show how many uses of the word DUOS was out in the marketplace, that it was a

pretty common descriptor used by a lot of consumer[-]packaged goods companies." Day 3 Tr. 268:14-22.

27.     Extensive third-party use of the term "duos" strongly influenced Mr. Love's decision to go forward with the descriptor "duos" in connection with the WHITE OWL product that was then under development. Day 3 Tr. 268:23-269:1.

> ### i.   *Factor 2 - The Overall Commercial Impression that each Party's Goods Present to Consumers*

28.     The parties' product identifiers are used on packaging that is markedly different, each respectively reflecting the starkly different types of products being offered.

29.     The WHITE OWL products are packaged in an attention-grabbing manner with bold colors to emphasize mass-market appeal. Colorful images on the packaging communicate the dual nature of the WHITE OWL "duos" product. The overall packaging highlights the low price and value of the product and provides a distinct visual appeal. Because the term "duos" on the WHITE OWL products is descriptive, consumers tend to look to other identifying elements and brand character to determine the source of the products. Day 3 Tr. 179:9-180:14; [ECF No. 294-8 (image of pouch)].



30.     Mr. Love provided a detailed description of how Swedish Match designed the WHITE OWL duos foil pouch. Day 3 Tr. 178:4-182:9. At the top there is a bright yellow price banner, which is consistent with other WHITE OWL cigarillo products. Day 3 Tr.

178:15-17. Below the yellow pricing banner are the words "Slow Burning Cigarillos," followed by the WHITE OWL logo with the Artic Owl holding a cigar with its talons. Day 3 Tr. 178:24-179:2; 179:11-12. Beneath the WHITE OWL logo is the descriptor, 'duos,' which is meant to convey that the pouch included two complementary flavored cigars. Day 3 Tr. 179:13-18. The next design element is a chevron with images reflecting the flavored cigarillos inside to further communicate to the end consumer that there are two different flavored cigarillos in the same pouch. Day 3 Tr. 179:23-180:7. The bottom of the package clearly states the number of each flavored cigarillo contained within the pouch, for example, "one berry and one cream." Day 3 Tr. 180:8-13; *see also* [ECF No. 231-1, 29:8-13; 29:14-31:21; 33:13-20].

31.     The front of the WHITE OWL pouch is the most important to the consumer experience because it is the side of the packaging that is visible to the end-consumer at the time of purchase. Day 3 Tr. 271:2-15.

32.     Every package of Swedish Match's WHITE OWL cigarillos displays the WHITE OWL brand and Arctic Owl design. *See* [ECF No. 264, ¶5(II) (depicted)]. The WHITE OWL brand has been in use for more than 130 years and is well known by consumers. Day 3 Tr. 132:19-24. This was confirmed by



Dr. Taylor, whose opinions and testimony were unrefuted. Day 4 Tr. 192:17-25.

33.     The cigarillos within the WHITE OWL pouch are small (4.25 to 4.75 inches in length) and thin (27 to 28 ring gauge), and are designed to be smoked as is, without having to trim or cut either end with a cigar cutter or other method. [ECF No. 294-19]; Day 4 Tr. 51:7-15, 69:19-21. It takes about 10 to 15 minutes to smoke a cigarillo, and the smoke is typically inhaled. Day 4 Tr. 69:22-25, 70:6-9.

34.     Swedish Match did not sell the products at issue directly to end consumers. Rather, its customers are third-party distributors, wholesalers, and large chains. Its products are sold to these customers in cardboard uprights. [ECF No. 294-18]. Each singular upright includes 15 individual pouches and is designed to fit into the display cases that third-party retailers typically use behind the counter. Day 3 Tr. 157:3-8, 157:10-14.

35.     The WHITE OWL products are displayed on shelf space behind the counter at convenience stores. Certain portions of the upright were designed to be removed when displayed on shelves, as seen below:



[ECF No. 294-19]. The front pouch was opened during a trial demonstration showing both the "angle-cut" and the "closure" ripped off. Day 3 Tr. 157:15-18, 220:18-221:8.

36.     A consumer looking to purchase a WHITE OWL duos product would enter a convenience store, go up to the cash register, and ask the store clerk for a WHITE OWL duos pouch, pointing to the shelf behind the register where the WHITE OWL products are displayed. The clerk would then retrieve the WHITE OWL duos pouch for purchase. Day 3 Tr. 155:25-156:13; Day 4 Tr. 16:11-17:4.

37.     Swedish Match designed planograms to instruct the retail locations to display its various WHITE OWL products next to each other. This is referred to as "brand blocking" and is a common practice in the industry. Day 3 Tr. 157:19-158:13. Brand blocking makes it easier for the store clerk to know where to find the WHITE OWL products. Day 3 Tr. 158:5-7. Brand blocking means that consumers did not merely encounter the WHITE OWL duos products alone but were also presented with other WHITE OWL products such as WHITE OWL Minis, WHITE OWL Black Sweets, and WHITE OWL Swirls. Day 4 Tr. 15:6-16.

38.     The conspicuous and repeated use of the WHITE OWL brand along the shelf space within the stores strongly mitigates against confusion as to the source of the goods.

39.     GCC's packaging, in contrast, is elaborate and is geared to evoke an old-world Cuban lifestyle with the use of old-style lettering and images harkening back to a

traditional Cuban-style cigar and to Cuba in general. Day 2 Tr. 46:2-7, 61:19-25, 62:11-14; Day 4 Tr. 37:5-38:5.

40.    The GCC website refers to the Guantanamera DUO cigar as an "ultra premium cigar"[5], and describes the Guantanamera DUO product as follows:

> *Guantanamera DUO Doble Maduro is handmade in Miami, Florida by skilled Cuban Master cigar rollers. DUO has a big 60 ring gauge and is 6 inches long. It's a beautiful and luxurious cigar that's rich and bold in flavor with notable tropical aromas. Guantanamera cigars are known for their balance, smooth draw and excellent construction [sic]. They're hand made with Cuban-seed Habano long-fillers from Nicaragua blended with Honduran grown Cuban-seed Habano Ligero. The binder is Nicaraguan grown Habano and the wrapper is a 10-year aged Habano lead from Nicaragua.*

Day 2 Tr. 46:8-12; [ECF No. 264, ¶5(X)].

41.    The colors and fonts used are subdued and classic. Day 2 Tr. 61:19-25, 62:11-14. GCC sells its DUO cigars in packs of 25, five, and individually. Day 1 Tr. 15:8-11.

42.    When sold in packs of 25, the cigars are housed in a wooden box as depicted below:

---

[5]    GCC uses its DUO mark only in connection with a line of its premium cigars. Although Mr. Montagne testified that at some undefined period of time GCC had considered selling cigarillos under its "Guantanamera" brand name, he expressly testified that GCC never had plans to sell non-premium cigars "under the [DUO] name." Day 1 Tr. 149:6-13.



[ECF No. 294-1]. Plaintiff's name "Guantanamera" appears on the outside of each box more than 20 times. Day 2 Tr. 61:9-14. The word "DUO" appears on the outside of each box only once. Day 2 Tr. 61:9-14 (the Undersigned was able to view the box presented at trial and only saw DUO in a single location).

43.     A bag of five Guantanamera DUO cigars is sold as follows:



[ECF No. 294-4]. This packaging does not include "DUO," but rather displays only the Guantanamera mark. Day 2 Tr. 72:12-73:2; [ECF No. 294-4].

44.     A single DUO cigar is sold wrapped in cellophane. [ECF No. 294-5].

45.     A Guantanamera DUO cigar can be more than seven inches in length, and it is quite thick, with a 54 ring gauge (54-64ths inch in diameter). It has a "very dark, oily natural tobacco leaf wrapper" and is "quite rustic-looking." Day 4 Tr. 53:20-25. A consumer must cut the cigar before lighting it, and it would typically take more than an hour to smoke. Day 4 Tr. 67:13-68:9, 68:10-15. Premium cigars are not meant to be inhaled. Day 4 Tr. 68:16-20.

46.     GCC's product packaging for the Guantanamera DUO cigars includes an instructional card, provided in four different languages, to instruct consumers to store the Guantanamera DUO cigars in a humidor. Day 2 Tr. 73:11-16. GCC itself stores its Guantanamera DUO cigars in a walk-in humidor within its café. Day 2 Tr. 76:20-77:2.

47.     Visitors can browse and inspect the premium cigars before purchase. They are often assisted by experienced salesclerks, such as Mr. Montagne, and are offered advice and recommendations with respect to which premium cigars to purchase. Day 1 Tr. 10:16-11:6.

### ii.     Factor 3 - The Similarity or Differences in the Goods

48.     The FDA defines a "premium cigar" as a cigar that, among other things, is hand-made, wrapped in whole tobacco leaf, and is unflavored. Day 3 Tr. 287:25-288:19; [ECF No. 294-21]. Mr. Rushabh Patel, Defendants' cigar industry expert, testified this is a well-known and commonly used definition in the cigar industry. Day 3 Tr. 284:14-17. Mr. Patel's testimony and opinions were unrebutted.

49.     In contrast, a "mass market" cigar is generally a smaller sized cigar that is machine-made in large quantities for the mass-market consumer. Day 3 Tr. 291:11-20. The ingredients typically include a homogenized tobacco leaf ("HTL") wrapper and/or HTL binder. Day 3 Tr. 291:21-24. Mass-market cigars are often flavored. Day 3 Tr. 291:25-292:2. Mr. Patel testified that this is the commonly understood and accepted definition of mass-market cigars within the cigar industry. Day 3 Tr. 292:11-14. His testimony and opinions were unrebutted.

50.     GCC's Guantanamera DUO cigars are "premium cigars" as defined by the FDA. Day 3 Tr. 290:23-291:6. Swedish Match's WHITE OWL duos cigarillos were *not*.

51.     The Guantanamera DUO cigars are unflavored. [ECF No. 264, ¶5(OO)]. The WHITE OWL duos products *were* flavored. *Id.* at ¶5(NN).

52.     The Guantanamera DUO cigars are handmade. Day 2 Tr. 61:6-8. The WHITE OWL duos products were machine-made. [ECF No. 264, ¶5(NN)]; Day 4 Tr. 51:16-52:14.

53.     The Guantanamera DUO cigars are sold in Plaintiff's café at a cost of $8 to $12 each, and at the time of trial the online price on GCC's website was $13.75 each. Day 1 Tr. 151:15-24; Day 2 Tr. 49:1-7; Day 4 Tr. 18:13-15. The average selling price of a WHITE OWL duos cigarillo was 50 cents each. Day 4 Tr. 35:16-21; 214:15-16.

54.     Mr. Patel opined that mass-market cigars do not compete with premium cigars, and vice versa. Day 4 Tr. 65:15-17.

### iii. Factor 4 - Similarity of Sales Methods

55.     The typical purchasing environment for a mass-market, machine-made cigar is a convenience store or gas station. Day 4 Tr. 57:7-58:4.

56.     The typical purchasing environment for premium cigars, including those offered by GCC, is either online or in-store, typically in a tobacconist or a cigar lounge. Day 4 Tr. 58:5-59:5.

57.     Swedish Match does not sell its products directly to end consumers. Day 3 Tr. 135:12-22; Day 3 Tr. 135:23-136:1. Swedish Match did not offer the product for sale through its website. Day 3 Tr. 161:12-22.

58.     GCC sells premium cigars at its single location in Little Havana in Miami. It also sells its Guantanamera DUO cigar (and other products) through its website. Day 2 Tr. 33:14-20.

59.     The only evidence that consumers might purchase both premium and non-premium cigars in the same transaction was anecdotal. Mr. Montagne testified that GCC's consumers purchase the Guantanamera DUO cigars and separate machine-made HTL cigars in a single transaction on an "every day, every week" "daily" basis. Day 1 Tr. 19:4-10. However, there was no documentary evidence to support this assertion, nor was it otherwise corroborated.

60.     Mr. Plumpe, Defendants' damages expert, reviewed GCC's financial records and did not find a single instance in which a GCC consumer purchased a

Guantanamera DUO cigar and a mass market cigar in the same transaction. Day 4 Tr. 210:7-211:1.

61.    GCC produced no evidence that any entity sold both parties' products.

62.    GCC has never sold WHITE OWL duos products in its store or on its website. Day 1 Tr. 158:16-21.

63.    GCC produced no evidence that its Guantanamera DUO cigars were ever sold in the same retail outlet as the WHITE OWL duos products. [ECF No. 264, ¶5(LL)].

64.    GCC produced no evidence that its Guantanamera DUO cigars were ever sold in the same online retail outlets as the WHITE OWL duos products. *Id.* at ¶5(MM).

65.    The GCC website states that the Guantanamera DUO cigars can be found only in "exclusive tobacconists." Day 2 Tr. 48:4-7. GCC admitted that convenience stores, where the accused products were sold, are not exclusive tobacconists. Day 2 Tr. 48:8-10.

66.    There is little overlap between the consumers of mass market cigars and premium cigars. Swedish Match conducted focus group research on both its packaging design and potential flavor combinations. Day 3 Tr. 186:8-12. Those focus groups included only mass-market cigar smokers. They excluded premium cigar smokers because "these are two separate, different consumer groups." Day 3 Tr. 187:25-188:9.

67.    Defendants introduced a peer-reviewed article published in Nicotine and Tobacco Research in 2018, titled "U.S. Adult Cigar Smoking Patterns, Purchasing Behaviors and Reasons For Use, According to Cigar-Type Finding From the Population

Assessment of Tobacco and Health (PATH) Study, 2013 to 2014" (the "PATH Study"). *See* [ECF No. 294-22 (the "Corey Article")].

68.     The PATH Study was a national, authoritative survey conducted by public health researchers with more than 45,000 respondents and funded by the National Institute of Health and the Food and Drug Administration. Day 4 Tr. 10:7-18, 113:16-20. The PATH Study confirms certain notable differences in the demographic of mass market cigar users versus premium cigar users which are directly relevant to the analysis of this factor.

69.     For example, the PATH Study confirms that mass market consumers: (1) skew younger and less affluent; (2) are less likely to be college educated; (3) are ethnically diverse; (4) are more budget conscious; (5) have high levels of brand loyalty; (6) are highly likely to purchase in person through convenience stores/gas stations; and (7) likely smoke on a daily basis. *See* Corey Article 1462-63.

70.     The PATH Study also confirms that premium cigar smokers: (1) skew older and more affluent; (2) are more likely to be college educated; (3) tend to be white/non-Hispanic; (4) tend not to be price sensitive; (5) have less brand loyalty; (6) are highly likely to purchase in smoke shops/specialty stores and cigar bars, with nearly 25% of premium smokers not purchasing in person; and (7) are less likely to smoke on a daily basis. *See* Corey Article 1462-63.

71.     Mr. Patel agreed with the above findings for both premium and mass market cigar users. Day 4 Tr. 60:2-11; Day 4 Tr. 60:12-20; *see also* Day 4 Tr. 17:17-22. Dr. Taylor did as well. Day 4 Tr. 146:8-17. This testimony and opinions were unrebutted.

### iv.     Factor 5 - Similarity of Advertising Media

72.     The parties' respective advertising was minimal and utilized different media. GCC ran a Spanish-language advertisement during certain Miami Heat home games on ESPN Spanish Radio in 2014 or 2015. Day 1 Tr. 149:14-150:19. There was no evidence that Swedish Match conducted any radio advertising.

73.     GCC claimed to have attended certain trade shows, Day 1 Tr. 32:10-12, but introduced no evidence that Swedish Match attended or advertised the products at issue at those same trade shows.

74.     Other than its website and certain point of sale materials, Swedish Match does not conduct any marketing or advertising directed towards its end consumers. All of its marketing and advertising are directed towards its distributors and wholesalers, and those marketing materials are not viewed by the end consumer. Day 3 Tr. 136:2-17; 138:11-139:3; 140:12-23.

75.     There was no evidence of any trade shows attended by both parties where the general public was also present. Day 3 Tr. 136:22-137:4.

76.     While both parties advertised on certain Point of Sale ("POS") materials, no evidence was introduced that any consumer for either product had viewed any POS materials of the other product.

77.     Defendants' expert Mr. Patel testified that the marketing strategies between premium cigars and mass-market cigars are different because the strategies are directed "to appeal to two different sets of customers." Day 4 Tr. 40:10-15.

78.     GCC uses social media platforms like Facebook, Instagram, and TikTok to advertise its cigars. Day 1 Tr. 92:21-25. Swedish Match does not advertise on social media. [ECF No. 231-5, 16:20-24].

79.     GCC sells its premium cigars on its website; it does not sell non-premium cigars on its website. Day 1 Tr. 29:19-20, 142:5-6. Swedish Match does not sell WHITE OWL products (or any of its tobacco products) from its WHITE OWL website. Day 3 Tr. 149:16-20.

80.     Swedish Match's WHITE OWL website is solely a marketing tool for promotional purposes. Day 3 Tr. 161:12-22. In addition, a user must undergo a strenuous process to get access to the information on the WHITE OWL website, including registering with a username and password to confirm their age before obtaining access. Day 3 Tr. 161:23-162:15. The WHITE OWL brand and the Surgeon General Warning are prominently (and persistently) displayed on every page of the website. Day 3 Tr. 164:13-165:12; *see also* Day 3 Tr. 181:16-182:2.

81.     Mr. Montagne testified that GCC presents accurate information on its website, and that he reviews the website from time to time to confirm its accuracy. Day 2 Tr. 33:8-13; Day 2 Tr. 44:25-45:2. The GCC website describes the Guantanamera DUO cigars as "a magnificent ultra premium cigar with a sophisticated Cuban taste." Day 2 Tr. 45:3-7; 46:8-12.

82.     Swedish Match's trade announcement of the switch from WHITE OWL "duos" to WHITE OWL "pairs" was used solely in trade advertising directed at third-party distributors, wholesalers, and large chains, not end consumers. Day 3 Tr. 148:7-20; [ECF No. 289-40].

### v.     *Factor 6 - Defendants' Intent*

83.     There is no evidence that Swedish Match intended to trade off the goodwill of GCC in deciding to use the descriptor "duos" in connection with the accused products. In fact, the evidence is explicitly to the contrary. *See, e.g.*, Day 3 Tr. 197:15-25.

84.     Swedish Match's intent in selecting the descriptive term "duos" was to describe the characteristics of its products. Day 3 Tr. 195:19-196:2. No evidence was introduced that Swedish Match intended to trade off any goodwill that GCC may have developed in the DUO mark.

85.     Swedish Match introduced extensive testimony and evidence concerning its decision process to use the descriptor "duos." That process began in late 2018 and early 2019. Day 3 Tr. 175:24-176:2; [ECF No. 231-1, 47:25-48:6].

86.     Mr. Love testified that when the idea originated for putting two different complementary-flavored cigars in the same pouch, they "looked at a lot of descriptive terms" and how those terms might communicate the idea of two different flavored cigars in a single pouch to the end consumer. Day 3 Tr. 175:13-19. Here, "DUOS was an idea of two different products that were complementary, and [they] thought that was pretty common English language in describing, you know, two of something that kind of matched together." Day 3 Tr. 175:20-23.

87.     Mr. Love ultimately decided to use the term "duos" on the WHITE OWL product line because "[i]t went through a lot of focus group research, and so it was the one descriptor that came from the top from a consumer understanding standpoint . . . ." Day 3 Tr. 176:6-10. The term "duos" was selected for the WHITE OWL product in March of 2019. Day 3 Tr. 176:11-14. At that point, Swedish Match "started to refine the packaging." Day 3 Tr. 191:1-16.

88.     Once the product packaging was essentially complete, it was submitted to in-house counsel for review and an online trademark search was conducted by counsel on or about March 11, 2019, as part of its normal process. Day 3 Tr. 191:22-24.

89.     That search uncovered GCC's DUO mark. While the results of the search were verbally reported to Mr. Love, he testified that he made the decision to use the term "duos" in connection with the products at issue *before* the trademark search was conducted and thus *before* learning the results of that search. Day 3 Tr. 197:15-18. Mr. Love

testified that at the time he chose to use the term "duos" on the WHITE OWL products, he was "absolutely not" trying to trade on GCC's goodwill or benefit from GCC's business reputation. Day 3 Tr. 197:19-25.

90.     Mr. Love did not *ignore* the results of the trademark search. Rather, having learned that a premium cigar company had a trademark for the word "duo," Mr. Love reconsidered how the company planned on using the word and ultimately decided, based on his 30 years of experience, that there was little risk of consumer confusion. Day 3 Tr. 192:2-193:6. At the time of the trademark search, Mr. Love was also aware of numerous third-party companies using the words "duo" or "duos" in connection with various consumer goods containing two of something. Day 3 Tr. 193:10-12.

91.     Mr. Love's decision to go forward was supported by documentary evidence admitted at trial. At the time Mr. Love learned the results of the trademark search, a member of Mr. Love's team, Katherine Macomber, conducted "an internet search to look at what other DUOS are out there, in terms of consumer[-]packaged goods, [and] who else was using it." Day 3 Tr. 193:13-19, 268:7-11. Ms. Macomber prepared a presentation of her findings that "outlined a number of graphic pictures of the use of DUOS across several consumer-packaged goods, categories, everything from potato chips, to candy, to chocolate bars, confectionary goods." Day 3 Tr. 195:2-7. Ms. Macomber gathered this information, in part, because she wanted to "show how many uses of the word DUOS

was out in the marketplace, [and] that it was a pretty common descriptor used by a lot of

consumer[-]packaged goods companies." Day 3 Tr. 268:14-22.

92.     Regarding the presentation, Mr. Love testified that:

> When you see that many different examples of DUOS being used – the
> word "DUOS" being used with established, known consumer brands
> like KitKat DUOS or Starburst DUOS, at that point in time, I knew that
> they were using it the same way that I had intended to use it, which is
> that they were flavor combinations.

Day 3 Tr. 195:19-196:2. The extensive third-party use of the term "duos," as reflected in

the presentation Ms. Macomber prepared [ECF No. 290-20], strongly influenced Mr.

Love's decision to go forward with the WHITE OWL duos product descriptor. Day 3 Tr.

195:19-196:2.

93.     While Mr. Love may have learned that a premium cigar company owned

the mark DUO from the trademark search conducted in March 2019, he did not learn of

GCC's name until April 2021, when the cease-and-desist email was received by Swedish

Match. Day 3 Tr. 196:6-10. This was about two years *after* Mr. Love had decided to use

"duos" on the WHITE OWL product. Day 3 Tr. 198:17-23.

94.     Before receiving the cease-and-desist email, Mr. Love had never heard of

GCC, had never seen any GCC product, had never seen any of GCC's products in

convenience stores or trade shows, and had never visited GCC's website. Day 3 Tr. 197:4-

14.

95.    Mr. Love testified that he does not believe Swedish Match did anything wrong with the WHITE OWL duos product, but still took the cease-and-desist email and the Complaint that followed a couple of weeks later "very seriously." Day 3 Tr. 201:10-16; 203:2-8.

96.    Within days of Swedish Match receiving the Complaint, Mr. Love decided to replace the term "duos" with "pairs." Day 3 Tr. 203:2-20, 225:12-18, 226:17-20; [ECF No. 231-1, 48:9-17]. Swedish Match spent approximately $140,000 to implement the change. Day 3 Tr. 232:5-11; Day 4 Tr. 229:15-230:11. The change took about four months to implement, which was "record speed" for Swedish Match. Day 3 Tr. 226:17-20.

97.    At the time Swedish Match decided to change from duos to pairs, the company had already made (and presold) the WHITE OWL duos Strawberry and Lemonade flavor combination bearing the duos descriptor. Day 3 Tr. 205:1-20. That flavor combination was set to launch on May 5, 2021, and that launch date had been announced to Swedish Match's sales force and its customers (*e.g.*, its distributors) the previous September (*i.e.*, September 2020). That was standing operating procedure for the company. Day 3 Tr. 204:13-17, 205:1-4.

98.    Thus, at the time the company decided to change from duos to pairs, the sales force had already presold the WHITE OWL duos Strawberry and Lemonade cigarillos flavor combination to its direct customers, the operations group had already produced the product (including the packaging), and all of the finished goods were in

inventory in Dothan, Alabama, ready to be shipped to satisfy the previously announced May 5, 2021 shipping date. Day 3 Tr. 205:14-20. Swedish Match continued to ship that product throughout the four-month promotional window -- while at the same time implementing the change from duos to pairs for its future flavor combinations. Day 3 Tr. 226:21-227:2.

99.     Mr. Love's testimony established a lack of bad faith motive in Swedish Match continuing to ship the WHITE OWL duos Strawberry and Lemonade product after receiving the Complaint. Mr. Love did not believe there had been any wrongdoing, and, accordingly, he concluded that it would be unwarranted to forgo the investment in manufacturing, designing, packaging, and selling of the WHITE OWL duos products already in inventory. Day 3 Tr. 259:16-260:11.

100.    Swedish Match made no effort to educate the end-consumer of the change from "duos" to "pairs." Day 3 Tr. 213:21-214:12. Mr. Love testified that he did not think there was any goodwill associated with the word "duos" and instead, Swedish Match was trading on the goodwill of the WHITE OWL name. Day 3 Tr. 214:22-215:6.

### vi.     *Factor 7 - Actual Confusion*

101.    GCC did not present evidence of any actual consumer being confused as to the source of Swedish Match's WHITE OWL duos products. [ECF No. 264, ¶5(TT)].

102.    GCC attempted to show consumer confusion through search engine results, but this provided neither direct nor circumstantial evidence of actual consumer

confusion. Dr. Taylor's opinions confirmed that consumer confusion is not likely to occur through the internet, or otherwise. Day 4 Tr. 147:10-15, 150:15-151:17. His opinions were unrebutted.

103.     Mr. Montagne testified that he conducted a Google search for Defendants' WHITE OWL duos products and both the Guantanamera DUO cigars and the WHITE OWL duos cigarillos appeared in the search results. Day 1 Tr. 114:22-115:3. He also testified that as of the day of trial "[i]f you do a search for the Defendants' products both" the Guantanamera DUO cigars and the WHITE OWL duos cigarillos show up. "As a matter of fact, they both always show." Day 1 Tr. 115:12-17. Mr. Montagne further testified that he conducted a Google search for WHITE OWL duos the day before trial and testified that the search results showed both Guantanamera DUO cigars and WHITE OWL duos cigarillos. Day 1 Tr. 115:23-116:6. GCC submitted no corroborating or documentary evidence to support his assertions.

104.     During Mr. Montagne's cross examination, Defendants conducted a live Google search for "WHITE OWL duos" and presented Mr. Montagne with the results. Mr. Montagne conceded that neither Guantanamera nor Guantanamera DUO cigars appeared in the search results for Defendants' product, nor did WHITE OWL duos cigarillos appear in the search results for GCC's product. Day 2 Tr. 49:9-23; 50:1-2; 50:10-51:4.

105.    The Court does not find Mr. Montagne's testimony about alleged confusion through search engine results convincing or persuasive.

## III.    CONCLUSIONS OF LAW

GCC's three claims all share two elements which GCC must establish: "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)); *see FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, 416 F. Supp. 3d 1381, 1388 (S.D. Fla. 2019) ("The tests for common law trademark infringement and unfair competition are the same as the tests for federal trademark infringement and unfair competition."); *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1025–26 and n.14 (11th Cir. 1989) (recognizing that the "elements of common law and statutory trademark infringement are the same" and that a claim of unfair competition premised on an alleged trademark infringement is "practically identical" to an infringement claim).

### A.  GCC Has Trademark Rights in the DUO Mark

Before trial, the parties stipulated that GCC "is the owner of incontestable U.S. Trademark Registration No. 3,664,534 for "DUO" for use in connection with Cigars in International Class 34, registered as of August 4, 2009. The Registration became

incontestable in 2016 after Plaintiff filed its Section 8 and 15 Affidavits with the United

States Patent and Trademark Office ("USPTO")." [ECF No. 227].

Therefore, GCC has established the first element of its claims.

## B.  There is No Likelihood of Confusion

In determining whether there is a likelihood of confusion, the Court examines the

following seven factors:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the
> infringed and infringing marks; (3) similarity between the goods and
> services offered under the two marks; (4) similarity of the actual sales
> methods used by the holders of the marks, such as their sales outlets and
> customer base; (5) similarity of advertising methods; (6) intent of the alleged
> infringer to misappropriate the proprietor's good will; and (7) the existence
> and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774–75; *see also Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 127 (11th Cir.

2022).

Likelihood of confusion occurs "when a later user uses a trade-name in a manner

which is likely to cause confusion among ordinarily prudent purchasers or prospective

purchasers as to the source of the product." *Wreal*, 38 F.4th at 126-27 (citing *Cap. Films

Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387, 397 (5th Cir. 1980)).[6]

The Eleventh Circuit **requires** the district court to consider all seven factors in its

analysis. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007) ("In this

---

[6]      As *Wreal* noted in footnote 10, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th
Cir. 1981) (en banc), the newly-formed Eleventh Circuit adopted as binding precedent all
of the decisions of the former Fifth Circuit handed down before October 1**,** 1981.

[C]ircuit, we are required to consider each of the seven factors."). "[A]pplication of [these] factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649 (11th Cir. 2007).

"The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision." *Wreal*, 38 F.4th at 127 (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986). "The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Id*. A court, however, is "required to consider each of the seven factors." *Id.* (citing *Forman*, 509 F.3d at 1361).

The type of mark and evidence of actual confusion are the most important factors. *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 947 (11th Cir. 2023) ("In drawing the ultimate inference about likelihood of confusion, the two most important circumstantial facts are respectively actual confusion and the strength of the mark.").

In determining that there is no likelihood of confusion, the Court has weighed all seven factors, each of which is discussed in detail below. As set forth below, two of the factors favor GCC and the remaining factors favor Swedish Match. On balance, the Court concludes that (1) consumers would not believe that Swedish Match's WHITE OWL duos are connected in any manner with GCC's DUO cigars and (2) ordinarily prudent

purchasers or prospective purchasers are unlikely to be confused about the source of the WHITE OWL's duos cigarillos.

> ### i.    Strength of GCC's Mark

The strength of a mark dictates the level of protection it receives. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir. 1983). In determining the strength of a mark, the Court weighs three factors: (1) the distinctiveness of the mark; (2) whether the mark has been declared as "incontestable" under 15 U.S.C. § 1065(3); and (3) the extent of third-party use of the mark. *See Ocean Bio–Chem, Inc. v. Turner Network Television, Inc.*, 741 F. Supp. 1546, 1554 (S.D. Fla. 1990).

There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. "The categories are based on the relationship between the name and the service or good it describes." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

Plaintiff's mark is "incontestable under 15 U.S.C. section 1065, "meaning that [its] validity is 'presumed and 'cannot be challenged on the ground[] that [it is] merely descriptive, even if the challenger can show that the mark[s] [were] improperly registered initially.'" *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL 4438518, at *1 (11th Cir. Sept. 28, 2021) (quoting *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 328 (11th Cir. 1989) (some alterations in original)). Incontestability creates a presumption that GCC's mark must be characterized, at a minimum, as suggestive or descriptive with

a secondary meaning. *HBP, Inc. v. Am. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1329

(M.D. Fla. 2003), aff'd sub nom. *HBP, Inc. v. Am. Marine Holding*s, 129 F. App'x 601 (11th

Cir. 2005) (citing *Dieter*, 880 F.2d at 329).

   This presumption is unique to the Eleventh Circuit. *Sovereign Mil. Hospitaller Ord.*

*of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the*

*Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, The Ecumenical Ord.*, 809 F.3d

1171, 1183 (11th Cir. 2015) (stating that the presumption established in *Dieter* is an

"outlier").[7] Two separate appellate panels, comprised of Judges Marcus, William Pryor,

and Jill Pryor and Judges Branch, Grant and Tjoflat have acknowledged that "[t]he law

in this Circuit is almost certainly incorrect" or might rest on "faulty ground." *Id.* at 1183;

*see also FCOA LLC*, 57 F.4th at 950 n.13 ("Although *Dieter* may rest on faulty ground, a

---

[7]    The *Sovereign Mil.* Court noted that:

The majority of circuits to consider the question have held that incontestability does not affect the strength of a mark for purposes of confusion. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 935 (4th Cir. 1995); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986); *Munters Corp. v. Matsui Am., Inc.*, 909 F.2d 250, 252 (7th Cir. 1990); *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), abrogated in part on other grounds by *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990); *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1008 n.13 (10th Cir. 2014). *But see Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th Cir. 1991) (agreeing with our Circuit). The Trademark Trial and Appeal Board agrees with the majority view. *See Safer, Inc. v. OMS Invs., Inc.*, 94 U.S.P.Q.2d 1031, 1036 (T.T.A.B. 2010). As do the leading treatises. *See, e.g.*, 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:155 (4th ed.); Restatement (Third) of Unfair Competition § 21, reporter's note (1995).

809 F.3d at 1183.

decision being wrong does not mean that it lacks legal force.").

If the Undersigned were to evaluate GCC's DUO mark independent of *Dieter's* presumption, then I would conclude that the mark is merely descriptive -- i.e., a weak mark. The term duo is not limited to describing two singers, as GCC has urged this Court to find. Indeed, the similarities between multiple products across varied industries demonstrates that duo is often viewed in a more-generalized manner, meaning two of something or two things which complement each other.

GCC's product falls in this category:

Here, the parties stipulated that the Guantanamera DUO cigar is advertised and promoted as a *double maduro* cigar. [ECF No. 264, ¶5(X)]. Mr. Montagne further testified that double maduro refers or describes the strength and/or color of the cigar. Day 1 Tr. 156:5-20. Moreover, Mr. Patel, Swedish Match's cigar industry expert, testified that a double maduro has one of two meanings in the industry: (1) that the wrapper leaf of the cigar is fermented *twice*, and thus the wrapper is extra dark or (2) that both the wrapper and the binder of the cigar are maduro leaves, and combining a maduro wrapper with a maduro binder makes a double maduro cigar. Day 4 Tr. 42:5-18. Mr. Patel testified that his analysis showed that Guantanamera's DUO cigar was the latter, as it used maduro leaf for both the wrapper and the binder. *Id.* at 42:17-18. Although Mr. Montagne testified that "DUO" is entirely unrelated to the characteristics of the product, Day 1 Tr. 67:13-25, 68:1-4, the Undersigned does not find this testimony (which is actually an opinion)

convincing.

However, as the Eleventh Circuit has repeatedly held, *Dieter* **remains the law in this jurisdiction.** Thus, GCC's ownership of an incontestable mark entitles it to a presumption that the mark is, at a minimum, descriptive with a secondary meaning, which is a *relatively* strong mark. Swedish Match's evidentiary presentation failed to rebut this presumption.

The presumption of strength afforded to incontestable registered trademarks can be rebutted "by a strong showing of third-party use of the mark that significantly impacts consumer recognition of the original mark." *FCOA LLC*, 57 F.4th at 950. However, Defendants failed to provide a "strong showing" of legitimate third-party use. The evidence on this issue arises only from the testimony of Defendants' expert, Dr. Taylor. For the reasons described below, the Court does not find Dr. Taylor's testimony sufficiently convincing on this issue to warrant a conclusion that the presumption has been rebutted.

Dr. Taylor testified that he "conducted an internet search . . . to look at how companies were using the term 'DUO' on products that they market." *See* Day 4 Tr. 121:20-22. Although Dr. Taylor testified that he searched for the terms "DUO cigars," "DUO tobacco," and "DUO products," there is little additional information concerning the legitimacy of the websites he visited, the legitimacy of the products on those websites, and other relevant characteristics of those products (e.g., how long have the products

been in commerce, how popular are the products, where are the products typically sold, etc.).

First, Dr. Taylor testified that although his search returned "52 that used the word 'DUO' in conjunction with a product," only 20 of those results were related to *tobacco* products; and, of those, he attempted to purchase only three products to confirm that they were actually available in commerce (and not merely cached websites of discontinued products). Day 4 Tr. 122:22-123:9, 140:12-20.

To begin with, the Court does not find Dr. Taylor's testimony concerning third-party use of "DUO" in connection with unrelated goods like computer security systems, deodorant, coffee or candy, Day 4 Tr. 139:22-140:11, sufficient for Defendants to meet their burden. The Eleventh Circuit recently acknowledged that it "ha[s] not been entirely clear about whether third-party uses in other markets diminishes a mark's strength." *See FCOA LLC,* 57 F.4th at 951 n.14. Recognizing the lack of clarity, *FCOA LLC* synthesized the inconsistent rulings and held that "other-market uses can diminish a mark's strength, but not always to a significant extent—certainly not always to the point of making a mark weak." *Id.*

Given the "strong showing" required to rebut the presumption of strength afforded to an incontestable mark, the third-party use of DUO in other markets which Dr. Taylor's research uncovered is insufficient to meet that burden. *Id.* (stating that "foremost" was a descriptive mark turned relatively strong by its incontestable status and

reversing lower court's determination that "the existence of 62 registered trademarks and 541 registered business names in various states using the term 'foremost'" was sufficient to rebut the *Dieter* presumption because there was no reliable evidence that the marks were active); *see also Breakers of Palm Beach v. Intern. Beach Hotel Dev.*, 824 F. Supp. 1576, 1583 (S.D. Fla. 1993) ("Unauthorized third[-]party use does not necessarily diminish the strength of a mark. The significance of third[-]party use is evaluated based on the entire name and symbol, the type of business in which it is used, and geographic location." (internal citation omitted)).

With respect to third-party use of the term DUO in markets other than tobacco, Dr. Taylor testified that his employer used Sysco's DUO security system, that he has used Old Spice DUO, he enjoys the Keurig coffee pot DUO, and has tried KitKat DUOS and Starburst DUOS. Day 4 Tr. 140:3-11. Dr. Taylor did not offer any insight as to the sales of those products, whether all the products are still available, or locations where the products can be purchased. At bottom, these cursory descriptions of 32 third-party products in markets other than tobacco are insufficient to rebut the *Deiter* presumption.

Dr Taylor also testified that his research uncovered twenty tobacco product-related uses of the term DUO. Of these twenty products, Dr. Taylor attempted to purchase only three: the Philip Morris IQOS DUO product (a heatstick), a Davidoff cigar cutter, and Winston DUO cigarettes. Day 4 Tr. 140:12-20. Notably, none of these products were actually *cigars*.

Only one of the products -- Winston DUO cigarettes -- were actual cigarettes. Although Dr. Taylor purchased 20 packs for $71.98, he never received the goods. Day 4 Tr.at 184:22-23. Further, under questioning from Plaintiff's counsel, Dr. Taylor was unable to provide any convincing testimony about reputation of the selling website and whether the sale complied with applicable tax laws. Day 4 Tr. at 181:17-185:7. Thus, the Undersigned cannot rely on this product as evidence of a legitimate use of the DUO mark in the tobacco industry.

Defendants' reliance on the Philip Morris IQOS product bearing the "DUO" name is also unhelpful. As with the Winston DUO cigarettes, Dr. Taylor did not convince the Court that this product was sold by a legitimate and legal source. Dr. Taylor appears to have purchased the Philip Morris IQOS product through a black or gray market site operating from Russia or Ukraine, which he knows very little about. Day 4 Tr. 186:18-188:5. The Undersigned need not address Plaintiff's arguments concerning the history of Philip Morris' attempts to trademark DUO in connection with its IQOS products or the legality of IQOS products in the United States because Dr. Taylor's testimony on this issue has not convinced the Court that this is a legitimate product which would impact GCC's incontestable mark.

Finally, the Undersigned does not find Dr. Taylor's purchase of a *cigar cutter* utilizing the term duo (without any additional information concerning sales, consumer base, etc.) to be sufficient to rebut the *Dieter* presumption.

In summary, the law in this Circuit *requires* the Undersigned to determine that GCC's DUO mark is, at a minimum, descriptive with a secondary meaning unless Defendants have rebutted the presumption. The evidence Defendants presented on this issue is lacking. Were it not for the presumption, the Undersigned would be inclined to determine that GCC's mark is merely descriptive (i.e., a weak mark). However, because GCC's mark is incontestable, and Defendants have failed to rebut the presumption, the Undersigned finds that it is a *relatively* strong mark. *FCOA LLC,* 57 F.4th at 951.

This factor favors Plaintiff.

### ii. *Factor 2 - Similarity of the Marks -- overall commercial impression*

"Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260–61 (5th Cir. 1980) (quoting Restatement of Torts § 729, cmt. B (1938)) (internal quotation marks omitted). A court "must also consider the commercial impression created by the mark as a whole." *Id.* at 261 (collecting cases). Stated differently, "[i]n evaluating the similarity of marks, [the court] must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.,* 756 F.2d 1525, 1531 (11th Cir. 1985).

As will be explained below, other than the presence of the term duo, the products

share little else in common.

Every package of Swedish Match's WHITE OWL cigarillos is a foil pouch that displays the famous WHITE OWL brand and Arctic Owl design. In convenience stores -- the primary location where WHITE OWL duos were sold -- consumers are exposed to multiple WHITE OWL products behind the counter, such as WHITE OWL minis, WHITE OWL sweets and WHITE OWL swirls.

The WHITE OWL products are packaged in an attention-grabbing manner with bold colors to emphasize mass-market appeal. On the packaging, colorful images communicate the dual nature of the "duos" product. The overall packaging highlights the low price and value of the product and uses bright colors to attract attention.

GCC's commercial presentation conveys a markedly different impression. GCC's packaging is elaborate and is geared to evoke an old-world Cuban lifestyle with the use of old-style lettering harkening back to a traditional Cuban-style cigar. The primary element on GCC's packaging is the house mark GUANTANAMERA, which is displayed on the outside of the wooden boxes of 25-pack cigars and on plastic bags used for 5-pack cigars. In contrast, GCC's "DUO" mark appears only once on the outside of the cigar boxes and not a single time on the plastic bags used for 5-pack cigars. And where GCC's "DUO" mark does appear, it is diminutive when compared to the prominent use of GUANTANAMERA. The colors and fonts used are subdued and classic. The premium cigars are presented in the traditional wooden cigar box, not a foil pouch, and no pricing

information is included.

Here, both GCC and WHITE OWL emphasize the marks Guantanamera and WHITE OWL, respectively, drawing considerable attention away from the mark at issue in this case. *Cf. FCOA LLC*, 57 F.4th at 953 (finding that "foremost" marks were similar, when all inferences were made in the plaintiff's favor because "foremost" was the "dominant part of both marks and what consumers would focus on"). Further, every other aspect in presentation which would impact how consumers perceive the respective products is in all respects different. Therefore, this factor favors Defendants.

### iii.    Factor 3 - Similarity of the Goods

The third likelihood of confusion factor is the similarity between the goods and services offered under the two marks. The record is clear that Plaintiff and Defendants used "DUO" and "DUOS" respectively in connection with tobacco products, namely, cigars. The Court does not need to look further than the pretrial stipulations for this. For example, the parties stipulated as follows:

- Plaintiff has been continuously using the "DUO" mark in commerce throughout the United States in connection with cigars since 2008.
- Defendants' accused products are composed of two cigars of different flavors.
- All cigars, irrespective of size, are classified by the United States Patent and Trademark Office in International Class 34.

[ECF No. 264, (5) B, H, I].

At trial, Defendants presented evidence that the Swedish Match cigarillos shared few characteristics in common with GCC's "DUO" Cigars. Defendants' expert, Rushabh

Patel, testified that the products are different sizes and prices, that Defendants' cigars are flavored, but that Plaintiff's cigars are not flavored, and that Plaintiff's cigars are "premium cigars" while Defendants' cigars are "mass market cigars." *See* Day 3 Tr. at 280:4-292:22; Day 4 Tr. at 5:22-19:16, 29:5-70:11. However, this is not the relevant inquiry.

The question of whether there is similarity between products requires a "determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 934 (11th Cir. 2010). Here, Mr. Patel's testimony supports GCC's position that the respective goods are similar for purposes of this factor.

For example, Mr. Patel's own company, Unitabac, sold both premium cigars like GCC's "DUO" cigars and mass-market, machine-made cigars like Swedish Match's WHITE OWL duos. Day 4 Tr. at 85:16-20. Mr. Patel sold flavored and unflavored cigars under a single brand. Day 4 Tr. at 86:19-25. He also admitted that he offered premium cigars and machine-made mass-market cigars from "a single source." Day 4 Tr. 94:10-12 ("Q: So your mass-market cigars and premium cigars all came from a single source; isn't that correct? A: Yes . . . ."), 98:17-20 ("Q: So the same manufacturer that made the mass-market cigars for you also previously made premium cigars for you as well; correct? A: Yes . . . .").

As additional evidence that the public might attribute both types of products to

the same source, the Court notes that Swedish Match registered the "SWEDISH MATCH" trademark in connection with "tobacco, cigarettes, *cigars, cigarillos* . . . ." [ECF No. 289 (emphasis added)].

The Court is also persuaded by the USPTO's refusal to register multiple trademarks based on likelihood of confusion with Plaintiff's "DUO" mark despite the fact that the products arguably have *less* in common than GCC's "DUO" cigars and WHITE OWL's duos cigarillos. For example, the USPTO refused registration of "DUO-3" for use in connection with electronic cigarettes [ECF No. 289-20] and "DUO" for use in connection with electronic vaporizers and atomizers, oral vaporizers, namely vape pens and advanced personal vaporizers [ECF No. 289-21]. In both decisions, the USPTO cited likelihood of confusion with Plaintiff's trademark registration for "DUO" for use in connection with cigars as the basis for the refusal.

Further, at least one court in this district has already determined that the public would attribute two types of tobacco products to the same source. In *Drew Estate Holding Co. v. Fantasia Distrib., Inc.,* now-Chief United States District Court Judge Cecilia Altonaga determined at the summary judgment stage that there was no "dispute as to whether hookah and cigars are reasonably attributable to the same source." 875 F. Supp. 2d 1360, 1371 (S.D. Fla. 2012). If hookah and cigars are similar enough that they are "reasonably attributable to the same source," then certainly cigars and cigarillos (even if they are different price and size) are also "reasonably attributable to the same source."

Although there are distinguishing features between GCC's "DUO" cigars and WHITE OWL duos cigarillos, the issue is not whether the products are identical, only whether they are "reasonably attributable to the same source."

As such, the third factor falls in Plaintiff's favor.

       *iv.*    **Factor 4 - Similarity of the Parties' Retail Outlets, Trade Channels, and Customers**

The similarity-of-actual-sales-methods factor contemplates the similarity of the parties' customer bases. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1284 (11th Cir. 2020), cert. denied, 142 S. Ct. 74, 211 L. Ed. 2d 12 (2021). According to the Eleventh Circuit,

> "Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899, 101 S. Ct. 268, 66 L.Ed.2d 129 (1980). This factor takes into consideration where, how, and to whom the parties' products are sold. *See* 4 McCarthy, supra, § 24:51, at 24–71. Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, *see Jaguar Cars Ltd. v. Skandrani*, 771 F. Supp. 1178, 1184 (S.D. Fla. 1991), though evidence that the products are sold in the same stores is certainly strong. The parties' outlets and customer bases need not be identical, but some degree of overlap should be present.

*Frehling Enters., Inc*, 192 F.3d at 1339.

Said differently, the courts must consider "where, how, and to whom the parties' products are sold." *GLD, LLC v. Gold Presidents, LLC*, No. 20-21617-CIV, 2021 WL 148737, at *6 (S.D. Fla. Jan. 15, 2021). This consideration is not in a vacuum, courts may also look

at the sophistication of the consumers and the care taken by them in making purchasing decisions. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1281 (11th Cir. 2020) ("When we analyze the likelihood of confusion, we are mindful that 'sophisticated consumers' of complex goods or services 'are less likely to be confused than casual purchasers of small items.'").

More sophisticated consumers who exercise a greater degree of care in their purchasing decisions are less likely to be confused as to the source of the goods in question. *Id.* Higher-priced items tend to suggest more sophisticated consumers exercising a higher degree of care. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1292 (11th Cir. 2018) ("These are customers in the market for a high-end, expensive fishing boat. As such, they are likely more discerning—and so less easily confused—than customers purchasing everyday products.").

The facts demonstrate that the channels of trade and the parties' primary customer base are markedly different. To begin, the Court notes that GCC has failed to present even a single instance in which both its "DUO" cigars and WHITE OWL duos cigarillos were sold by the same entity or at the same physical location. At most, GCC can argue that both products are sold on the internet. If this was all that was required, however, then this factor would be rendered meaningless due to the fact that most products available in the economy can be purchased online.

GCC sells primarily at its single-site café in the Little Havana neighborhood and on its website. Swedish Match, on the other hand, sells the lion's share of its products at convenience stores. Although independent distributors offer Swedish Match products online, this accounts for less than 2% of Swedish Match's overall sales. In summary, there is no meaningful overlap in the channels of trade between the two products, which favors Defendants.

The parties' respective target consumer bases are also vastly different -- although each are sophisticated in their own right.

GCC's consumers are cigar aficionados who appreciate and seek out "premium" cigars and tend to be highly knowledgeable about the marketplace and exercise considerable purchasing care. The degree of consumer care is enhanced by the fact that each Guantanamera DUO cigar costs as much as $13.75 per cigar, more than 20 times the average price of the WHITE OWL duos cigarillos. A further indication of purchasing care is the fact that GCC's consumers are often assisted by cigar experts (including GCC's own president), who frequently advise consumers and provide information about the products. Aficionados, particularly when assisted by GCC staff, are unlikely to confuse the source of a $0.50 flavored cigarillo with a $14 premium cigar.

Finally, while consumers of WHITE OWL duos flavored cigarillos typically paid $0.99 for two cigarillos, this lower price point does not indicate that these consumers exercise less care in purchasing decisions. The undisputed evidence also shows that

consumers of mass-market cigarillos are also extremely brand loyal. This high brand loyalty also suggests a much higher degree of consumer care, making this factor favor Defendants as well.

As discussed in the findings of fact above, the PATH Study[8] confirms that mass market consumers: (1) skew younger and less affluent; (2) are less likely to be college educated; (3) are ethnically diverse; (4) are more budget conscious; (5) have high levels of brand loyalty; (6) are highly likely to purchase in person through convenience stores/gas stations; and (7) likely smoke on a daily basis. *See* Corey Article 1462-63. This is in stark contrast to premium cigar smokers, who: (1) skew older and more affluent with more disposable income; (2) are more likely to be college educated; (3) tend to be white/non-Hispanic; (4) tend not to be price sensitive; (5) have less brand loyalty; (6) are highly likely to purchase in smoke shops/specialty stores and cigar bars, with nearly 25% of premium smokers not purchasing in person; and (7) are less likely to smoke on a daily basis. *Id.*

---

[8]     The PATH Study was a national, authoritative survey conducted by public health researchers with more than 45,000 respondents and funded by the National Institute of Health and the Food and Drug Administration. Day 4 Tr. 10:7-18, 113:16-20. The PATH Study confirms certain notable differences in the demographic of mass market cigar users versus premium cigar users which are directly relevant to the analysis of this factor. *Id.*

On this factor, GCC can point to only anecdotal evidence or inconsequential areas of overlap between sales. The fact that Mr. Montagne or Maximilian Lovera[9] can remember instances where customers sometimes purchased from his store both premium cigars and cigarillos is insufficient to outweigh differences noted by the comprehensive Corey Article.[10] Further, GCC's efforts to identify overlaps in trade channels fail to overcome the stark reality that WHITE OWL duos are primarily sold in convenience stores (typically, gas stations) and GCC's DUO Cigars are primarily sold in its physical location or on its website.

The parties' respective channels of trade and customer base share little, if anything, in common. This factor favors Defendants.

### v.    *Factor 5 – Similarity of Advertising*

The different marketing and advertising approaches by GCC and Swedish Match also show that consumer confusion is unlikely. "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980). The relevant inquiry is whether

---

[9]    Plaintiff presented Maximilian Lovera's testimony through deposition designations. [ECF No. 231-7].

[10]    The Corey Article synthesizes the information obtained by the PATH study in order to "describe[] individual user characteristics, tobacco use patterns, purchasing behaviors, and reasons for use separately for traditional premium and nonpremium cigars, cigarillos, FCs, and cigarettes." [ECF No. 294-22]. The Corey Article is meant to "provide a better understanding of the cigar marketplace and inform future strategies to reduce the death and disease from cigar smoking." *Id.*

there is likely to be a significant overlap in the target audience of the media in which the parties advertise, such that confusion is likely. *See Frehling*, 192 F.3d at 1340 (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982)).

By way of example, if both entities advertise on the same local radio station, then there could be a finding of overlap. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat. Univ., Inc.*, 91 F. Supp. 3d 1265, 1281 (S.D. Fla. 2015), aff'd sub nom. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir. 2016) ("Both FIU and FNU have advertised on the same local radio station, WLRN. The Court finds that this is sufficient to create a likelihood that the same consumers would be exposed to both marks.").

In contrast, two separate internet websites, although each found on the internet, could weigh in favor of a finding that consumers would understand the entities to be distinct enterprises. *See Tana*, 611 F.3d at 778 (finding that the parties' websites "would dispel rather than cause confusion . . . because the websites are separate and distinct, suggesting two completely unrelated business entities").

Here, neither party devotes substantial advertising money to media-based advertising, thus making overlap virtually non-existent. Instead, both parties primarily advertise at the point of sale -- which, as noted previously, does not overlap. The parties' website advertising is also distinct and separate. GCC's website is easily accessible by anyone on the internet and serves both promotional and sales purposes. Swedish Match's WHITE OWL website requires user verification on a variety of factors, including age,

before access and serves only promotional purposes (i.e., there is no sales function). *See*

*Tana*, 611 F.3d at 778.

Mr. Montagne testified that GCC advertised in certain magazines between 2015 and 2016. Day 1 Tr. 69:6-18. There is no evidence that Swedish Match has ever advertised in the same magazines, or any consumer-facing magazines at all. Mr. Montagne also testified that GCC previously advertised on ESPN Spanish radio in 2014 or 2015 during certain Miami Heat games. Day 1 Tr. 149:14-150:19. No evidence was presented that Swedish Match advertised on the radio or that either party advertised on the radio during the period of the accused infringement. GCC's social media-based advertising on media platforms such as Facebook, Instagram, and TikTok, Day 1 Tr. 92:21-25, also does not create any overlap because Swedish Match does not promote its products through any social media.

Given the lack of overlap in advertising, Swedish Match's minimal consumer-facing advertising other than point-of-sale and a verified-only accessible website, and GCC's minimal advertising efforts beyond point-of-sale, its website, and social media platforms, the Court finds that this factor favors Defendants.

### vi.    *Factor 6 - Intent*

The intent factor asks whether the "defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Frehling*, 192 F.3d at 1340. Like numerous other companies that use "duo" to describe things sold in

pairs or having other dual characteristics, Swedish Match's intent in selecting its descriptor was to describe the characteristics of its products, not to trade on any goodwill associated with GCC. The record is devoid of any evidence to the contrary -- the Court finds no evidence of bad faith intent in this case.

In looking at intent, courts determine "whether the defendant had a conscious intent to capitalize on [the plaintiff's] business reputation, was intentionally blind, or otherwise manifested improper intent." *GLD, LLC,* 2021 WL 148737, at *6 (citing *Custom Mfg.*, 508 F.3d at 648) (internal quotation marks omitted). "[P]rior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Michael Caruso v. Estefan Enters.*, 994 F. Supp. 1454, 1462 (S.D. Fla. 1998) (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)).

Swedish Match chose the term "duos" to describe the complementary flavors of the package containing two cigarillos. It did this in the same way that it used the descriptor "minis" for small cigarillos and "sweets" for sweetened cigarillos. Indeed, Swedish Match identified and chose the term "duos" before it even knew that GCC or its Guantanamera DUO cigar existed.

GCC's argument on this factor focuses on Swedish Match's knowledge of the "DUO" trademark before manufacturing and distributing WHITE OWL duos and Swedish Match's decision to continue to sell WHITE OWL duos after receiving a cease-and-desist letter from GCC's attorneys and after this lawsuit was filed. Although Mr.

Love did not affirmatively seek the advice of counsel in assessing whether moving forward with WHITE OWL duos might infringe on GCC's "DUO" mark, he and his team researched the use of the term duo by products in other industries.

This research informed his opinion that duo was a descriptive term. Indeed, in the majority of jurisdictions throughout the country -- where GCC would *not* be entitled to a presumption, as it is here, that its mark is relatively strong -- it is likely that courts would find that GCC's mark is merely descriptive. Thus, the mere fact that Swedish Match was aware of GCC's mark is insufficient for a finding of improper intent.

This factor favors Defendants.

### vii.    Factor 7 – Actual Confusion

Although "[t]he law is well settled in this [C]ircuit that evidence of actual confusion between trademarks is not necessary to a finding of likelihood of confusion," *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985), evidence of "actual confusion is the best evidence of the likelihood of confusion," *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010) (internal quotation omitted), **and the most important factor**, *FCOA LLC*, 57 F.4th at 947.

Plaintiff submitted no evidence of actual confusion. In assessing the probative value of a plaintiff's failure to present evidence of actual confusion, the court must consider "the circumstances of each case" such as "the extent of advertising, the length

of time for which an infringing product has been advertised, and any other factors that might influence the reporting of actual confusion." *FCOA LLC*, 57 F.4th at 947.

On this issue, the Eleventh Circuit's decision in *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1363 (11th Cir. 2019) is instructive. In *Hard Candy*, the appellate court held that the district court did not err in determining that the "absence of any evidence [of actual confusion was] significant." *Id.* The purportedly infringing product has been on the market eight months, sold more than 248,075 units (totaling more than $5 million in revenue), and was advertised extensively on social media.

WHITE OWL duos were sold in more than 75,000 convenience stores for nearly a year and a half. Swedish Match sold nearly 36 million WHITE OWL duos. Despite the overwhelming market presence, Plaintiff has not demonstrated a single instance of actual confusion.

Given the length of time WHITE OWL duos were for sale and Swedish Match's point-of-sale marketing efforts in more than 75,000 convenience stores, the Court determines the "absence of actual confusion [is] highly effective in showing. . . a low[] likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) (emphasis omitted), abrogated on other grounds by *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 123 S. Ct. 1115, 155 L.Ed.2d 1 (2003) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion,

that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.").

This factor falls in Defendants' favor.

**C. Conclusion**

Only two of the likelihood of confusion factors fall in GCC's favor. Of those factors, one is considered the second most important factor. The remaining five factors -- including the most important factor, evidence of actual confusion -- fall in Defendants' favor. GCC's success on the strength of mark factor rests on a legal anomaly unique to the Eleventh and Sixth Circuits; its success on the source of goods factor, in this context, does little to further its claim that consumers would be confused about whether Guantanamera was also the source of WHITE OWL duos.

As noted previously, determining whether a plaintiff has established the "likelihood of consumer confusion" requires an "evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649 (11th Cir. 2007). Here, GCC accuses Swedish Match of improperly purposing a mark which is not even the main focus of GCC's own "DUO" cigars. Although GCC claims that its mark is arbitrary or fanciful, the Undersigned disagrees. The inescapable fact for GCC is that Swedish Match's WHITE OWL duos share barely more than three letters in common. And, those three letters, as used through multiple industries, indicate **two of something**; in this case, a description of what a consumer will find in the package: two cigarillos.

At bottom, GCC has failed to establish that any consumer would be confused into believing that WHITE OWL duos originated from anyone other than Swedish Match or were in any way connected to Guantanamera's DUO cigars. Because GCC cannot establish a likelihood of confusion, all three of its trademark claims fail.

## IV. CONCLUSION

Plaintiff's failure to establish a likelihood of confusion means that Defendants are not liable for infringement of a federally registered trademark under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), or common law trademark infringement over the trademark "DUO" -- United States Trademark Registration No. 3,664,534.

Based on this determination, the Undersigned finds in favor of Defendants on their request for declaratory judgment from the Court that Swedish Match's use of the descriptor "duos" on its WHITE OWL cigarillos did not violate GCC's rights. Likewise, the Undersigned also finds that the facts established that Defendants' use of the descriptor "duos" was fair use because (1) their use of the mark was used as a descriptive term; (2) used otherwise than as a trademark; (3) the term was used fairly and in good faith; and (4) the term was used only to describe the party's own product, *see* 15 U.S.C. § 1115.

Accordingly, the Court finds in favor of Defendants on all three of Plaintiff's

counts and in favor of Defendants on both of their counterclaims.[11]

**DONE AND ORDERED** in Chambers, in Miami, Florida, on June 2, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record

---

[11]    The Court will enter a judgment in Defendants' favor in a separate document.